# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2003-CA-00369-SCT

*JOHN M. CLARK*

*v.*

*BRASS EAGLE, INC.*

| | |
|---|---|
| DATE OF JUDGMENT: | 12/16/2002 |
| TRIAL JUDGE: | HON. KENNETH L. THOMAS |
| COURT FROM WHICH APPEALED: | COAHOMA COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | DANA J. SWAN |
| ATTORNEYS FOR APPELLEE: | ARNULFO URSUA LUCIANO |
| | GERALD H. JACKS |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| DISPOSITION: | AFFIRMED - 02/26/2004 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE PITTMAN, C.J., EASLEY AND DICKINSON, JJ.**

**EASLEY, JUSTICE, FOR THE COURT:**

## PROCEDURAL HISTORY

¶1.     John M. Clark (Clark) filed this products liability action in the Circuit Court of Coahoma County,

Mississippi, against Brass Eagle, Inc. (Brass Eagle) and Chris Rico (Rico).  The suit arose out of an incident

which occurred on or about January 21, 1999, when Rico aimed a paintball gun manufactured by Brass

Eagle at Clark shooting him while Clark rode past Rico in his car.  The suit sought compensatory and

punitive damages alleging that the Brass Eagle Talon paintball gun was defectively designed by Brass Eagle

and contained inadequate warnings.  The trial court granted Brass Eagle's motion for summary judgment

finding the paintball gun did not malfunction and performed exactly as Clark and Rico expected.  The trial

court also determined that Clark and Rico understood and appreciated the inherit danger of using paintball guns without protective eyewear. Finding no genuine issues of material fact, the trial court granted summary judgment in favor of Brass Eagle and dismissed Brass Eagle from the case with full prejudice on December 19, 2002.[1]

**FACTS**

¶2.     Clark testified in his deposition that he purchased a paintball gun from a pawnshop approximately one to two weeks prior to the incident on January 21, 1999.[2] Clark had practiced with the gun in his backyard and knew how to screw in the cartridge, pump the gun and use its safety and trigger. Clark hunted and had taken a course in hunter safety education. Clark had seen the paintball protective eye masks at Wal-Mart when he purchased his cartridges and paintballs and knew the masks were for some sort of protection.

¶3.     Clark stated that he first learned about paintball when everybody else did and when everybody else was getting them. He bought the same kind that Rico used to injure him. Clark did not remember seeing any writing on the side of the paintball gun before the incident, but he stated he guessed that there was warnings on the side of the gun. Clark purchased the paintballs and the $CO_2$ cartridges from Wal-Mart. He did not read any warnings on any of the packages of the paintballs or on the $CO_2$ cartridges he purchased.[3] He bought his gun because everyone else had one. The only thing that he had heard that people did with the guns was shoot at cars. The game consisted of riding around and shooting at cars to

---

[1] Thereafter, on February 17, 2003, Rico was dismissed by consent order.

[2] Clark purchased his paintball gun from a pawnshop because he was looking for the cheapest price. Clark went to more than one pawnshop before he found one. The pawnshop where he purchased the paintball gun has since closed.

[3] $CO_2$ cartridges are used to propel the paintballs.

2

mark them with the paintball guns. The object of the game was to shoot at the car and not to shoot at open windows. No one Clark was shooting at was wearing the protective masks. Clark understood and appreciated the danger of shooting at people as is evident in his statement that it was "common sense" not to shoot anyone in the face with the paintball gun.

¶4.     Clark had seen protective masks for sale at Wal-Mart after he had purchased the gun. Clark testified that before he bought his paintball gun he had seen other people drive by shooting at other vehicles. Clark then decided to purchase one. Clark stated that they only shot paint balls at other vehicles that might have paintball guns. He testified that generally he had knowledge of the other guys that had paintball guns. Clark stated that his parents knew he had the paintball gun. In fact, Clark told his parents that he used his paintball gun to shoot at his friends' cars.

¶5.     Clark stated that he did not shoot at another person because he did not want to get shot back.[4] According to Clark, "I figured if I shot somebody, they were going to shoot me back." "If you shoot somebody, they would shoot you back, that's pretty much how it went." On January 21, 1999, Clark and his friends were riding around Clarksdale carrying two paintball guns in the vehicle with them. Clark was driving and had his paintball gun underneath his driver's seat.

¶6.     Rico testified in his deposition that on same night he and his friends were also riding around Clarksdale with two paintball guns in their vehicle. Rico also knew that the protective masks were sold by Brass Eagle and that the masks were for eye protection. Rico testified that he had purchased a Brass Eagle paintball gun the day of the incident for himself. In fact, Rico testified that a friend of Beth Burnham, who is a friend of Rico's, purchased the paintball gun Rico borrowed that night and used to shoot Clark. Rico's

_____

[4] Clark testified that while in elementary school he had engaged in B.B. gun wars where he shot other people and other people shot him.

3

dad purchased his paintball gun because he was not 18 and could not purchase it himself. He had not read the warning on the package on his paintball gun. Rico stated that he was sure he looked at the warnings or instructions on the side of the gun, but he did not "study" them. Rico further stated that he did not read any warnings in the manual, but he was sure that he saw the manual because it was "right there."

¶7.     According to Rico, "paint ball wars" were played by several people in each car riding by and shooting paintballs at the other's moving or parked car. Rico also stated that his paintball gun never malfunctioned, and it operated properly. Rico had also taken hunter safety education classes and was knowledgeable about how the paintball gun operated. Rico knew it was dangerous to shoot someone in the eye with the paintball gun and knew that there were protective masks available to protect the eyes and face from a paintball injury.

¶8.     According to Rico, at some point in the evening while he was parked at an area on West Second Street, Clark's vehicle pulled into the parking lot, and a passenger in Clark's vehicle shot a paintball hitting Rico's vehicle.[5]   In turn, Rico shot his paintball gun several times at Clark's vehicle. Clark testified that all he remembered about the incident was being hit in the eye. He did not recall anyone shooting at Rico's car. When he got home, he was rushed to the emergency room where he had surgery. Rico testified that he was "pretty sure" he and Clark had shot at each other earlier the night of the incident. Rico stated that he and Clark were acquaintances and not enemies. Rico testified that he never intended to shoot Clark, but to shoot the outside of the vehicle. However, Rico stated that he had in the past been shot through the car window in the arm. Clark testified that no one had shot at his car that evening before the incident in question.

_____

[5]  According to Clark, West Second Street was the strip where kids rode up and down looking for friends.

4

¶9.     In his deposition, Michael Small (Small), a retired Brass Eagle manufacturing engineer, testified that Brass Eagle Talon paintball gun was designed as an entry level paintball marker/gun generally used for target shooting and pump tournament play.[6] The paintball gun is used primarily for playing the sport of paintball. Small knew of no hazards associated with the Brass Eagle Talon paintball gun when used as it is designed and intended to be used. Small testified that nothing he saw or read indicated there was any manufacturing defect in this particular model of paintball gun.[7]

¶10.    Besides the depositions of Clark, Rico and Small, Brass Eagle also attached to its memorandum brief in support of its motion for summary judgment a copy of the safety warning information, operating instructions and consumer notice, that comes with the Talon paintball gun. The warning stated on the front page of the owner's manual:

> WARNING: This is not a toy. Misuse may cause serious injury or death. Eye protection designed for paint ball use must be worn by the user and any person within range. Recommend at least 18 years old to purchase, 14 years old to use with adult supervision, or 10 years old to use on paint ball fields meeting ASTM-Standard F1777-97. Read operation manual before using.

¶11.    Clark's expert witness, Dr. Richard Forbes (Forbes), Professor of Mechanical Engineering at Mississippi State University, testified that he reviewed the depositions taken in this case from Clark, Rico and Small, Brass Eagle's SEC filings and documents produced by Brass Eagle. Forbes concluded that within a reasonable degree of certainty, "the manufacturer should have provided videotape instructions and goggles for everyone in the vicinity of paint ball guns and their use." Forbes also concluded that unless a

_____

[6] Small testified that he retired from Brass Eagle in October of 2000.

[7] Rico discarded the actual paintball gun he used to shoot Clark. According to Rico, the paintball gun was thrown away by his mother.

better design alternative is "utilized, this paint ball gun was simply too dangerous to be given to the general public for use outside of controlled situations."

¶12.    In granting summary judgment for Brass Eagle, the trial court found that:

> According to the deposition testimony of Plaintiff John Clark and Defendant Chris Rico, the Brass Eagle product, namely the paint ball marker, did not malfunction and operated to their expectations. Plaintiff Clark has offered no credible evidence to show otherwise.
>
> Additionally, Plaintiff Clark admitted that he knew and understood the dangerous propensity of the gun through hunter education safety courses, his knowledge and understanding as to how to operate the paint ball marker, his practice in operating the marker and knowledge and understanding of the harm of shooting another person along with the possibility of being shot at and injured by another person. The Plaintiff and Co-Defendant Rico knew and appreciated the danger inherent in the use of paint ball guns without wearing protective eye wear.
>
> The Court concludes there is no genuine issues of material fact as to the Defendant Brass Eagle, Inc. Accordingly, summary judgment is proper in this case and judgment is entered in favor of Defendant Brass Eagle, Inc., and Defendant Brass Eagle, Inc., is hereby DISMISSED FROM THIS CASE WITH FULL PREJUDICE.

¶13.    Clark now appeals arguing that the trial court erred in determining that summary judgment was proper.

## DISCUSSION

### I.    Summary Judgment

¶14.    Clark argues that the trial court erred in granting summary judgment in favor of Brass Eagle because Forbes's affidavit created a triable issue.

¶15.    This Court conducts de novo review of orders granting or denying summary judgment and looks at all the evidentiary matters before it–admissions in pleadings, answers to interrogatories, depositions, affidavits, etc. *Aetna Cas. & Sur. Co. v. Berry*, 669 So.2d 56, 70 (Miss. 1996). This Court is governed by the same standard used by the circuit court under Rule 56 (c) of the Mississippi Rules of Civil Procedure. *Cothern v. Vickers, Inc.,* 759 So.2d 1241, 1245 (Miss. 2000); *Brown v. Credit Ctr.,*

6

*Inc.*, 444 So.2d 358, 362 (Miss. 1983). The evidence must be viewed in the light most favorable to the party against whom the motion has been made. *Berry*, 669 So.2d at 70. If there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law, summary judgment should be granted in the moving party's favor. *Cothern*, 759 So.2d at 1245; *Brown*, 444 So.2d at 362. The burden of demonstrating that no genuine issue of material fact exists is on the moving party. *Id*. And any doubt as to whether a fact issue exists should be resolved in favor of the non-moving party. The trial court's decision to grant summary judgment will be reversed where triable issues of material fact exist. *Richmond v. Benchmark Constr. Corp.*, 692 So.2d 60, 61 (Miss. 1997).

¶16. The Mississippi Legislature passed the Products Liability Act, Miss. Code Ann. § 11-1-63, codifying strict liability law. *Smith v. Mack Trucks, Inc*., 819 So.2d 1258, 1261 (Miss. 2002). While the procedural provisions of the Act became effective for all cases pending on July 1, 1993, the substantive provisions were not effective until July 1, 1994. *Id*. The Act created a "hodge podge mixture of the consumer expectations and risk utitlity tests," for a manufacturer or seller to pass in order to obtain protection if the product causes harm. *Id*. at 1266-67 (Smith, P.J., dissenting). Miss. Code Ann. § 11-1-63(a)(i-iii) provides that in order for a manufacturer or seller of a product to be liable, a claimant must prove by the preponderance of the evidence that at the time the product left the control of the manufacturer or seller:

| | | |
|---|---|---|
| (i) | 1. | The product was defective because it deviated in a material way from the manufacturer's specifications or from otherwise identical units manufactured to the same manufacturing specifications, or |
| | 2. | The product was defective because it failed to contain adequate warnings or instructions, or |
| | 3. | The product was designed in a defective manner, or |

4. The product breached an express warranty or failed to conform to other express factual representations upon which the claimant justifiably relied in electing to use the product; and

(ii) The defective condition rendered the product unreasonably dangerous to the user or consumer; and

(iii) The defective and unreasonably dangerous condition of the product proximately caused the damages for which recovery is sought.

¶17. Miss. Code Ann. § 11-1-63(b) further states:

A product is not defective in design or formulation if the harm for which the claimant seeks to recover compensatory damages was caused by an inherent characteristic of the product which is a generic aspect of the product that cannot be eliminated without substantially compromising the product's usefulness or desirability and which is recognized by the ordinary person with the ordinary knowledge common to the community.

¶18. In *Wolf v. Stanley Works*, 757 So.2d 316, 319 (Miss. Ct. App. 2000), the Court of Appeals correctly recognized Miss. Code Ann. § 11-1-63 as the "starting point" for a products liability claim:

A plaintiff has the burden of showing that the defect that allegedly was the proximate cause of injury existed at the time that the product left the hands of the manufacturer, and that the defect rendered the product unreasonably dangerous. Accordingly, the proof must support that no material change in that product occurred after leaving the manufacturer's control.

¶19. Furthermore, in any action alleging a product is defective "the manufacturer or seller shall not be liable if the claimant (i) had knowledge of a condition of the product that was inconsistent with his safety; (ii) appreciated the danger in the condition; and (iii) deliberately and voluntarily chose to expose himself to the danger in such a manner to register assent on the continuance of the dangerous condition." Miss. Code Ann. § 11-1-63(d)(i-iii).

¶20. The Minnesota Court of Appeals has denied recovery where one paintball player, Stephen Schneider, 17, sued another paintball player, Jake Erickson, age 16, after being shot in the eye by a paintball gun purchased at a Wal-Mart. *Schneider v. Erickson*, 654 N.W.2d 144 (Minn. Ct. App. 2002). In *Schneider*, the court found that the injured player, Schneider, who was not wearing eye

8

protection, appreciated the dangers involved and assumed the risk by not wearing eye protection. *Id*. at 151. The court found that while the other player owed a duty of care, the well-known inherent risks associated with the sport relieved the shooter of his duty of care. The court found that the risk of being shot in the eye with a paintball is inherent to the game of paintball. *Id*. The court affirmed the summary judgment as to the shooter finding that summary judgment was proper finding that the evidence was conclusive as to whether the risk of eye injury is inherent in the sport of paintball thereby leaving no issues for a jury to decide. *Id*. at 151-53.

¶21. Based on the depositions of Clark and Rico, we find that the trial court did not err in granting summary judgment in favor of Brass Eagle. The facts do not support any other conclusion.

¶22. Clark offered no proof that the paintball gun used in the incident failed to function as expected and offered no feasible design alternative which, to a reasonable probability, would have prevented what happened to him. In fact, Clark's testimony is detrimental to his claim. Clark testified that he was aware that there was protective eyewear available for purchase at Wal-Mart, but he chose not to do so. He was an active participant in shooting paintballs at other vehicles. The evening of the incident at issue here Clark and his friends in his car carried their paintball guns with them for that purpose.

¶23. Clark testified that his parents were aware that he had purchased a paintball gun and engaged in shooting paintballs at other friends' cars. Clark appreciated that there was a danger in shooting at people evidenced by his statement that it was "common sense" not to shoot anyone in the face with a paintball gun. Clark said that he guessed it was "common sense" to not shoot anyone in the eye. No one playing the "game" wore protective masks or eyewear.

¶24. Rico's testimony further supports the trial court's decision to grant summary judgment as to Brass Eagle. While Rico used a friend's paintball gun to shoot Clark, Rico's dad had bought a Brass Eagle Talon

9

paintball gun for him the day of the incident. Rico chose not to read any of the warnings or instructions on the side of the gun, in the manual or on the package. Rico was familiar with the paintball gun, having used other identical paintball guns in the past. Rico stated that "paint ball wars" were played by several people by riding around shooting paintballs at each others parked or moving cars.

¶25.    Rico testified that he knew it was dangerous to shoot someone in the eye with a paintball gun. Rico acknowledged that he knew protective masks were available. Rico also did not use any protective eyewear. Rico stated that he knew the purpose of the protective mask was to protect the eyes and the face from paintballs.

¶26.    The most crucial testimony occurred when Rico stated the paintball gun he was using never malfunctioned. According to Rico, the paintball gun functioned properly. Rico testified that his mom discarded the paintball gun he used. Rico's mother also threw away the paintball gun which his dad had recently purchased for him. The paintball gun in question was never examined by an expert. After summary judgment was granted to Brass Eagle, the lawsuit against co-defendant Rico was dismissed by consent between the parties.

¶27.    The trial court relied heavily upon the testimony of Clark and Rico in making its decision. Based on their deposition testimony, the trial court determined that the Brass Eagle paintball gun did not malfunction and operated to their expectations. The trial court found that Clark did not present any credible evidence that any genuine issues of material fact existed and, accordingly, granted summary judgment in favor of Brass Eagle dismissing the case with prejudice.

¶28.    Based on this record, the trial court did not err in granting summary judgment to Brass Eagle.

## CONCLUSION

10

¶29.    For these reasons, we affirm the judgment of the Circuit Court of Coahoma County granting

summary judgment to Brass Eagle, Inc.

¶30.    **AFFIRMED.**

   **PITTMAN, C.J., SMITH AND WALLER, P.JJ., COBB, CARLSON, GRAVES AND DICKINSON, JJ., CONCUR. DIAZ , J.,  NOT PARTICIPATING.**