United States Court of Appeals
Fifth Circuit

**F I L E D**

**December 15, 2004**

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS
FIFTH CIRCUIT**

No. 03-60760

MICHELLE GUY,

Plaintiff-Appellant,

versus

CROWN EQUIPMENT CORPORATION; ET AL.,

Defendants,

CROWN EQUIPMENT CORPORATION,

Defendant-Appellee.

On Appeal from the United States District Court
for the Northern District of Mississippi
(3:02-CV-126-SAA)

Before GARWOOD, JOLLY, and BARKSDALE, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:

For her design defect claim under the Mississippi Products Liability Act, MISS. CODE ANN. § 11-1-63 *et seq.* (MPLA), Michelle Guy challenges judgment as a matter of law awarded Crown Equipment Corporation, following Guy's case in chief. Guy contends the district court reversibly erred by excluding Guy's intended expert witness before trial and by excluding certain evidence offered during Guy's examination of Crown's expert, called as an adverse witness. In addition, Guy claims she presented sufficient evidence

during her case in chief to avoid judgment as a matter of law against her MPLA design defect claim. **AFFIRMED**.

I.

In 1999, Guy was injured at work in Mississippi while operating an electric stand-up lift truck, model RR3540-45, unit R112 (forklift), which was manufactured by Crown and was shipped to Guy's employer in 1995. Pursuant to the forklift's design, the operator enters the operator compartment at the end opposite the forks and, to operate the forklift, stands facing sideways to the forks. In that operating position, the compartment opening is to the left; the forks, to the right. Except for the compartment opening, which is wide enough for a person to enter sideways, the operator compartment is enclosed by four waist-high "walls". The forks apparatus raises 198 inches, and there is an overhanging "roof" that protects the operator from above. When operating the forklift, the operator leans back against a padded back and hip rest, which wraps around the wall the operator leans against.

When injured, Guy was operating the forklift in a "forks following" manner (operator-compartment opening moving forward and forks behind); the forklift hit metal railings on a warehouse floor. In that operating mode, the operator-compartment opening was moving toward the railings when the collision occurred. The forklift's maximum speed is six miles per hour; Guy testified she was traveling at about half-speed when she hit the railings. The

distance from the operator-compartment opening to the operator's left foot is approximately six inches.  The impact caused Guy to lose her balance, and her left leg came out of the operator compartment through the opening.  Guy's left leg was crushed between the forklift and the railings.

Guy sued Crown in Mississippi state court for, *inter alia*, strict liability under the MPLA, claiming:  the forklift was defectively designed; and Crown failed to warn of the danger of a left-leg injury.  Crown removed the action to federal court, based on diversity jurisdiction.  The parties agreed to proceed before a magistrate judge.  *See* 28 U.S.C. § 636(c).

In support of her primary MPLA claim, Guy intended to present expert testimony through John Lohman that the forklift was defectively designed because it lacked either an operator restraint (similar to a seat belt) or a door for the operator-compartment opening.  Crown moved *in limine* to exclude Lohman as an expert witness, asserting his testimony was unreliable and, therefore, inadmissible under Federal Rule of Evidence 702 (testimony by experts) and the test provided by **Daubert v. Merrell Dow Pharmaceuticals, Inc.**, 509 U.S. 579 (1993).  The district court granted the motion, ruling, *inter alia*, that Lohman had not presented any definitive theory, opinion, or MPLA feasible design alternative (discussed *infra*) that could be tested to prove the dangerousness *vel non* of Crown's forklift.

3

At trial, Guy presented only MPLA claims for design defect and failure to warn. To do so, Guy called as an adverse witness Dan Dunlap, Crown's Manager of Product Engineering (a Crown employee since 1978). Dunlap testified that one reason the forklift was designed without an operator-compartment door was to make it easier for the operator to exit the forklift in "tip-over" accidents, where the forklift falls on its side, and in "off-the-dock" accidents, where the operator mistakenly drives the forklift off a loading dock.

During Dunlap's testimony, Guy offered as evidence reports, obtained from Crown through discovery, of prior accidents involving all models of Crown forklifts. There were approximately 2,400 reports, but only 360 concerned left-leg injuries like Guy's. The district court excluded non-left-leg injury reports.

Along this line, Guy attempted to question Dunlap about a survey showing K-Mart employees preferred using forklifts with operator-compartment doors. K-Mart had purchased Crown forklifts, similar to the one on which Guy was injured, but with such doors. The district court excluded these surveys.

Following Guy's case in chief, Crown moved for judgment as a matter of law, under FED. R. CIV. P. 50(a)(1), contending Guy did not present sufficient evidence for a reasonable jury to decide in her favor under the MPLA on either the failure to warn or design defect claims. The motion was granted.

4

II.

The MPLA's substantive provisions became effective on 1 July 1994 and apply to all actions filed after that date. *See* MISS. CODE ANN. § 11-1-63 note (1993); **Clark v. Brass Eagle, Inc.,** 866 So.2d 456, 460 (Miss. 2004). The injured party must prove, by a preponderance of the evidence, that, when the product left the manufacturer: "[t]he product was defective"; that defect "rendered the product unreasonably dangerous"; and that "condition ... proximately caused the" injury. *See* MISS. CODE ANN. § 11-1-63(a). A defect that renders a product unreasonably dangerous can result from several situations. In general, the product: (1) "deviated in a material way from the manufacturer's specifications"; (2) did not "contain adequate warnings or instructions"; (3) "was designed in a defective manner"; or (4) "breached an express warranty". MISS. CODE ANN. § 11-1-63(a)(i). Here, Guy presents only a design defect claim.

For a design defect to render a product unreasonably dangerous, the injured party must show that, when the product left the manufacturer's control: (1) the manufacturer knew, or should have known, about the danger that caused the injury; (2) "[t]he product failed to function as expected"; and (3) "there existed a *feasible design alternative* that would have to a *reasonable probability* prevented the harm". MISS. CODE ANN. § 11-1-63(f) (emphasis added). "*A feasible design alternative* is a design that

5

would have to a *reasonable probability* prevented the harm *without impairing the utility, usefulness, practicality or desirability* of the product to users or consumers." MISS. CODE ANN. § 11-1-63(f)(ii) (emphasis added).

## A.

The three contested evidentiary rulings are reviewed only for abuse of discretion. *E.g.*, **Southern Pacific Transp. Co. v. Chabert**, 973 F.2d 441, 448 (5th Cir. 1992), *cert. denied*, 507 U.S. 987 (1993). Of course, for reversible error, the ruling must affect a substantial right. FED. R. CIV. P. 61 (harmless error); FED. R. EVID. 103(a), (d) (rulings on evidence); *e.g.*, **Jones v. Benefit Trust Life Ins. Co.**, 800 F.2d 1397, 1400 (5th Cir. 1986).

### 1.

The district court ruled that Guy's expert witness, Lohman, did not satisfy FED. R. EVID. 702 and **Daubert**. Because a district court has broad discretion in deciding the admissibility *vel non* of expert testimony, we will not find error unless the ruling is *manifestly erroneous*. **General Electric Co. v. Joiner**, 522 U.S. 136, 141-42 (1993); *see also, e.g.,* **Watkins v. Telsmith**, 121 F.3d 984, 989 (5th Cir. 1997); **Eiland v. Westinghouse Electric**, 58 F.3d 176, 180 (5th Cir. 1995). "Manifest error" is one that "is plain and indisputable, and that amounts to a complete disregard of the controlling law". **Venegas-Hernandez v. Sonolux Records**, 370 F.3d 183, 195 (1st Cir. 2004) (citing BLACK'S LAW DICTIONARY 563 (7th ed.

6

1999)); *see also* **Andreiu v. Ashcroft**, 253 F.3d 477, 490 (9th Cir. 2001) (Beezer, J., concurring); **LaCombe v. A-T-O, Inc.**, 679 F.2d 431*,* 435 (5th Cir. 1982) (manifest error where district court employed wrong standard in excluding a witness); **Bank One, Texas, N.A. v. F.D.I.C.**, 16 F. Supp. 2d 698, 713 (N.D. Tex. 1998) ("a manifest error is an obvious mistake or departure from the truth") (internal quotation omitted).

Rule 702, amended post-**Daubert** in 2000, provides that a witness "qualified as an expert ... may testify ... in the form of an opinion ... if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case". Amended Rule 702 reflects the Supreme Court's decisions in **Daubert** and its progeny emphasizing the district courts' broad latitude in weighing the reliability of expert testimony for admissibility. *E.g.,* **Daubert**, 509 U.S. at 591; **Kumho Tire Co. v. Carmichael**, 526 U.S. 137, 142 (1999). **Kuhmo Tire** clarified that the Rule 702/**Daubert** analysis applies to *all* proposed expert testimony, including nonscientific "technical analysis" and other "specialized knowledge". 526 U.S. at 141.

It goes without saying that **Daubert** clarified a district court's gate-keeping function: the court must ensure the expert uses reliable methods to reach his opinions; and those opinions

7

must be relevant to the facts of the case. The Supreme Court listed several non-exclusive factors to guide courts in their screening function: whether the proposed evidence or theory "can be (and has been) tested"; whether it "has been subjected to peer review and publication"; whether it has been evaluated in the light of "potential rate[s] of error"; and whether the theory has been accepted in the "relevant scientific community". *Daubert*, 509 U.S. at 593-94.

The *Daubert* factors remain relevant to the determination of the reliability of expert testimony under Rule 702, as amended. *See* FED. R. EVID. 702 advisory committee's note (2000 Amendment). The 2000 amendments to Rule 702 also reflect the Supreme Court's determination that the reliability analysis must remain flexible: not every *Daubert* factor will be applicable in every situation; and a court has discretion to consider other factors it deems relevant. *Kumho Tire*, 526 U.S. at 151. Although the *Daubert* analysis is applied to ensure expert witnesses have employed reliable principles and methods in reaching their conclusions, the test does *not* judge the expert conclusions themselves. *Daubert*, 509 U.S. at 594-95.

To assist in proving a design defect rendered the forklift unreasonably dangerous, Lohman intended to opine that a feasible design alternative existed for the RR model forklift that could have prevented Guy's injuries. Toward that end, Lohman submitted

8

a preliminary report on 2 January 2003, reconstructing Guy's accident and suggesting alternatives that could have prevented the injury; was deposed on 30 April 2003; submitted a supplemental report on 9 May 2003; and was again deposed on 25 June 2003. Trial was set for, and began, on 18 August 2003. On 16 July 2003, approximately a month before trial, the district court granted Crown's motion to exclude Lohman's testimony.

Lohman's January report opined: the forklift was unreasonably dangerous because it did not have a mechanism to restrain the operator to the operator compartment; and either an operator-compartment closure (metal or textile door) or an operator body restraint could have prevented Guy's injuries. That report, however, did not state which design alternative Lohman preferred; did not refer to specific designs Crown could adopt as alternatives; did not estimate the cost to Crown of either design; and did not state whether the design alternatives would satisfy the standard for a MPLA feasible design alternative — whether they would impair the usefulness, utility desirability, or practicality of the forklift.

In his 30 April deposition, Lohman stated he preferred an operator restraint device, as opposed to a door, as a safer design for the forklift; discussed the idea of a metal bar enclosure as another design alternative; admitted he had neither designed nor tested any of his suggestions; and stated that his sketch for a

9

metal bar across the operator compartment opening was a "conceptual drawing", rather than a precise design or prototype.

Lohman's 9 May supplemental report again recommended an operator restraint device, similar to a seatbelt, as the "most effective means of retention of an operator of this type of forklift". To illustrate examples of a possible operator restraining device, he attached print-outs from an Internet site selling airline seatbelt expanders. He also stated Crown's design process for the forklift was inadequate because Crown had not tested the feasibility of a restraint device.

That supplemental report discussed the economic feasibility of including a restraining device on the forklift and again suggested a door as a second-choice design alternative. Concerning a door, Lohman discussed, for the first time, operator-compartment doors already manufactured by Crown (for use by Ford on their Crown RR model forklifts) as a feasible design alternative; concluded doors must be safe and economically feasible because Crown already manufactured them; and stated, without further discussion, that a door would not impair the utility, usefulness, desirability, or practicality of the forklift.

In his second (final) deposition (25 June), Lohman reiterated his preference for restraining devices as a design alternative; noted Toyota manufactured a stand-up forklift equipped with a restraining device; stated Crown could use a similar design in its

forklifts; and stated that his research on this design alternative consisted of reading Toyota's website the day before being deposed.

Neither Crown nor the district court judge questioned Lohman's expert qualifications; but, in an extremely detailed and well-reasoned opinion, the court decided Lohman's opinions about both the restraining device and the door were untested and unreliable and thus failed the **Daubert** analysis. The district court disapproved of the approach Lohman used to reach his purported conclusions, finding he relied on unscientific conceptual sketches and broad ideas. It also disapproved of Lohman's failure to test any of his designs.

The district court did not exclude Lohman solely on his failure to test. The court also found: as close to the August trial as his 30 April deposition, Lohman had not reached any concrete conclusions about the *best* design alternative; although Lohman professed to prefer a restraining system to a door, he never specified which design he planned to support at trial, and, therefore, defendants did not have sufficient opportunity, before trial, to prepare a reply to his proposed opinions; and Lohman presented conceptual suggestions, instead of specifically formulated opinions. The district court ruled that these deficiencies, coupled with the lack of testing, rendered Lohman's expert opinion unreliable.

a.

11

In his reports and depositions, Lohman consistently advocated a *restraining device* as a feasible design alternative; but he never presented a specific design. Although he eventually suggested Crown could adopt a restraining device similar to Toyota's, he never submitted a complete "end product". "[T]he proper methodology for proposing alternative designs includes more than just conceptualizing possibilities". *Watkins*, 121 F.3d at 992. *As Guy conceded at oral argument here*, the district court acted within its broad discretion when it decided Lohman's conceptual suggestions about a restraining device as a feasible design alternative did not rise to the level of an admissible expert opinion.

b.

Regarding Crown's having manufactured, tested, and sold forklifts with *operator-compartment doors*, Guy contends: Lohman was qualified to examine Crown's tests and designs and testify about their feasibility, including safety; Lohman supported the door as a feasible design alternative; and the district court abused its discretion when it did not consider Lohman's suggestion to adopt Crown's pre-existing door design as a feasible design alternative.

i.

The district court did not fail to consider Lohman's qualifications to review Crown's door design and tests. Instead, the court noted that *Crown's tests* on a forklift with a door were only in "off-the-dock" or "tip-over" scenarios, *not* left-leg-injury scenarios, as was Guy's. Therefore, Lohman had reviewed only tests that did not concern *left-leg injuries*.

The district court did not base its decision on Lohman's inability to test the door design. Instead, its decision was based on Lohman's inability, so close to trial, to definitively offer a specific feasible design alternative. It was not until his 9 May (second) report that Lohman mentioned, as a feasible design alternative, the door already manufactured by Crown for Ford. Even then, he used equivocal language, showing he had not closely studied this design. For example, although Lohman estimated the per-forklift cost of the door, he only concluded cursorily, in the language of the MPLA, that the door would not impair the forklift's utility, usefulness, practicality or desirability. The district court did not commit manifest error in ruling inadmissible Lohman's proposed testimony concerning a door as a feasible design alternative.

2.

For Guy's case in chief, during the adverse witness testimony by Crown's earlier-referenced expert, Dunlap, Guy offered in

13

evidence 2400 reports produced by Crown concerning accidents involving its forklifts. Guy did so in the presence of the jury.

Upon Crown's objecting, a bench conference was held. Guy maintained all of the reports formed the basis for Dunlap's expert opinions. Crown responded that the reports were inadmissible hearsay and irrelevant. The district court sustained Crown's objection in part, admitting only reports concerning left-leg injuries like the one Guy suffered. In so doing, the court stated: "I don't want theatrics in this courtroom. So let's talk about what the facts really are, and let's don't be throwing box after box[,] with the jury thinking every single one of [the accident reports] is an accident just like Ms. Guy's". Later, after additional testimony, the court ruled the non-left-leg accident reports were not relevant.

Guy contends the district court abused its discretion when it refused to admit all of the reports, even though she admits on appeal some concerned non-relevant "slip and fall" accidents. She asserts all of those reports, not just those concerning left-leg injuries, formed the basis of Dunlap's expert testimony that an operator-compartment door would have caused more harm than good. Guy contends this reliance makes *all* the reports relevant. Crown responds the district court properly excluded the accident reports, other than for left-leg injuries, because those excluded were more prejudicial than probative. *See* FED. R. EVID. 403. Crown also

14

maintains Guy's substantial rights were not affected by those that were excluded because 360 were admitted.

a.

Federal Rule of Evidence 103(a)(2) (offer of proof) provides error may not be based on evidence being excluded unless "the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked". Guy did not make a formal offer of proof when Crown objected to the accident reports. Pursuant to Rule 103(a)(2), although a formal offer is not necessarily required in order for exclusion to be reviewed, "the proponent of excluded evidence must show in some fashion the substance of his proposed [evidence]". ***United States v. Winkle***, 587 F.2d 705, 710 (5th Cir. 1979).

When the district court asked if all the reports were related to forklifts without doors, *Crown* responded that the reports concerned all types of accidents, including slip and fall, involving all models of their forklifts. The court next asked: "How many accidents do we have relating to door versus no door, or leg injuries on an RR [model]?" *Guy* responded, explaining all of the reports concerned injuries sustained in forklifts without doors. In conjunction with Guy's maintaining all of the reports formed the basis for Dunlap's expert opinion, this was a sufficient, although scant, offer of proof.

15

b.

The district court did *not* abuse its discretion in excluding all but the 360 accident reports for left-leg injuries incurred by operators of forklifts without doors. For starters, the court noted, and criticized, the "theatrics" employed by Guy in offering the evidence – bringing boxes of accident reports into the courtroom, in the presence of the jury. Obviously, this was prejudicial. *See* FED. R. CIV. P. 103(c) (should not suggest inadmissible evidence to jury); FED. R. EVID. 403.

Moreover, the district court did not abuse its discretion in deciding more than 2000 accident reports were not relevant, especially because some of them did not concern injury while operating a Crown forklift. This was especially true in the light of the scant offer of proof by Guy. These some 2000 reports were globally offered by Guy, some were clearly inadmissible, and the district court was not bound on its own initiative to go through all 2000 of them, one by one, to determine which, if any, might be relevant. The non-left-leg injury reports (approximately 2000 in number) were also unfairly prejudicial, would confuse the issues, and would mislead the jury, among other things. *See* FED. R. EVID. 403.

3.

Finally, Guy contends the district court abused its discretion by not permitting Crown's expert, Dunlap, to answer questions about

16

surveys of K-Mart employees regarding the past use of operator-compartment doors on Crown's forklifts. Guy does *not* contend the surveys were admissible (they were *not* offered in evidence). Instead, she claims: Dunlap had personal knowledge of the relevant underlying facts disclosed in those surveys; therefore, he should have been permitted to testify about his claimed participation in, and knowledge gained from, the dealings with K-Mart.

In response, Crown claims: neither Dunlap nor Crown performed the K-Mart surveys; and any personal knowledge Dunlap may have had concerning the underlying facts resulted only from his reading the surveys. Therefore, Crown contends: any statements by Dunlap regarding the contents of those surveys would have constituted hearsay within hearsay; and both levels of hearsay had to satisfy exceptions to the hearsay rule. FED. R. EVID. 805; *see, e.g.*, **Rock v. Huffco Gas & Oil Co., Inc.**, 922 F.2d 272, 280 (5th Cir. 1991).

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered to prove the truth of the matter asserted". FED. R. EVID. 801(c). Such evidence is generally inadmissable unless it falls within an exception stated by the Federal Rules of Evidence. FED. R. EVID. 802.

Guy does not contend that Dunlap's desired testimony regarding his claimed knowledge of the surveys falls under any exception. Instead, Guy contends she should have been allowed to question Dunlap about his claimed personal involvement and resulting

17

knowledge concerning the K-Mart surveys.  The comments about Dunlap and Crown's participation *vel non* in the surveys were made, however, by counsel during the bench conference; no evidence was cited.  Along this line, Guy never attempted to question Dunlap about any personal involvement in the surveys.

Instead, prior to Crown's objection interrupting and ending the question, Guy asked:  "[I]sn't it true that when a survey of the various K-Mart factories was done, most of the factories came back and said that they wanted to keep the doors despite Crown's attempt" (at this point, Crown's objection terminated the incomplete question).  This question called for a hearsay response concerning the surveys' contents.  At the sidebar, when the court ruled the question called for inadmissible hearsay, Guy did not state why the desired testimony fell within an exception.  Instead, Guy questioned the ruling, asking:  "Even though Mr. Dunlap was involved with the process?"  Because Guy made no attempt to show Dunlap's desired testimony fell within an exception to the hearsay rule, the district court did not abuse its discretion in excluding it.

## B.

The judgment as a matter of law, awarded Crown at the close of Guy's case in chief, is reviewed *de novo*.  *E.g., Hidden Oaks Ltd. v. City of Austin*, 138 F.3d 1036, 1042 (5th Cir. 1998).  In doing so, "all reasonable inferences [are made] in the light most

favorable to the non-moving party". *Id.* Such judgment is proper when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue". *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 149 (2000) (quoting FED. R. CIV. P. 50(a)(1)). (Prior to trial, after the court excluded Guy's expert witness, Crown moved for judgment, asserting expert testimony is required to prove a MPLA claim. In denying the motion, the district court declined to rule on the necessity *vel non* of expert testimony for a MPLA claim. Following Guy's case in chief, Crown re-urged this point as a basis for judgment as a matter of law, but the district court again declined to base judgment on it. Crown's contention that a MPLA claim may *not* be proved without expert testimony is discussed *infra*.)

Again, to succeed on her MPLA design defect claim, Guy was required to prove, by a preponderance of the evidence, that, when the forklift left Crown's control in 1995: (1) Crown "knew, or should have known, about the danger that caused the damage for which recovery is sought"; (2) the forklift "failed to function as expected"; and (3) "there existed a feasible design alternative that would have to a reasonable probability prevented the harm" in 1999. MISS. CODE ANN. § 11-1-63(f). Crown does not contest its knowledge of the danger of left-leg crush injuries with this model

19

forklift.  *Nor does Crown contend that the forklift functioned as expected.**

The only design alternative Guy presented at trial was an operator-compartment door.  Therefore, pursuant to our *de novo* review and Rule 50(a)(1), we must determine whether Guy presented legally sufficient evidence for a reasonable jury to find that the door was a satisfactory MPLA feasible design alternative.  As discussed, for the operator-compartment door to satisfy that standard, Guy was required to prove that the door "would have to a reasonable probability prevented [her injury], without impairing the utility, usefulness, practicality, or desirability of the [forklift] to users or consumers".  MISS. CODE ANN. § 11-1-63(f)(ii).

The district court ruled Guy relied properly on Crown's pre-existing design and manufacture of a door for this model forklift

---

*        Pursuant to the MPLA's plain language, our court has held that, for design defect claims, the MPLA "unambiguously precludes recovery against the manufacturer on the basis of design defect unless the product failed to function as expected".  **Austin v. Will-Burt Co.**, 361 F.3d 862, 872 (5th Cir. 2004).  *At trial*, in moving for judgment as a matter of law, Crown contended, *unlike here*, that there was no evidence to prove the forklift failed to function as expected.  The district court disagreed, stating:

> The law requires ... the plaintiff prove that
> as a result of the design defect, the subject
> forklift failed to function as expected.
> [Y]ou do expect a forklift to function without
> injuring its operator.  So, in that sense, the
> plaintiffs *perhaps* have made that element of
> proof.

(Emphasis added.)

as evidence the door was a design alternative. The court found, however, that Guy presented no evidence that the door was a *feasible* design alternative: that it did not impair the utility, usefulness, practicality, or desirability of the forklift to users or consumers. Accordingly, the court ruled that, because Guy did not prove the door design satisfied the MPLA standard, she did not prove a design defect.

Guy asserts she produced the requisite evidence through the testimony of Crown's expert, Dunlap. Guy claims Dunlap's testimony provided the jury with ample evidence of the door's benefit: it decreased risk of left-leg injury; and Crown's already having manufactured forklifts with doors showed the feasibility of adding a door. Guy contends a jury could have applied a common-sense analysis to these facts and concluded the door satisfied the MPLA standard.

Crown responds that the district court concluded correctly that Guy did *not* show the door was a MPLA feasible design alternative because she failed to produce specific evidence for such factors as the cost of a door and how its inclusion would have affected the forklift's utility in terms of other possible dangers faced by forklift operators. Crown notes a major aspect of a design's utility is its safety, and claims Guy did not prove a forklift with a door is, *on the whole*, safer than one without. Along this line, Crown contends that, without the aid of expert

testimony, a jury cannot determine whether the addition of a door would pass the MPLA feasible-design-alternative analysis.

Based upon our *de novo* review, Guy did not present the requisite evidence for a reasonable jury to find that a door is a MPLA feasible design alternative.  In this regard, however, we note that the MPLA's plain language does *not* state expert testimony is required *per se* to prove a design defect.  *See* MISS CODE ANN. §§ 11-1-63(a), (b), (f).  *See also* **Malbrough v. Crown Equip. Corp**., No. 04-30118, slip op. 630, ___ F.3d ___ (5th Cir. 23 Nov. 2004) (holding, on interlocutory appeal, that expert testimony not always required by the terms of the *Louisiana Product Liability Act* to prove *prima facie* design defect).  In any event, we need not reach the question whether such testimony was required  because *Guy did present expert testimony*:  she called Dunlap, Crown's expert, as an adverse witness.

Dunlap, Guy's only witness testifying about the forklift design, presented no opinion, however, that a door would be a MPLA feasible design alternative.  His testimony was just the opposite: there were suitable warnings or instructions in the operator's manual to advise operators about the dangers of left-leg injuries; forklifts without doors were safe if used as instructed and were not likely to cause serious injuries; an operator of a forklift without a door could avoid left-leg injuries in most instances by keeping her leg within the operator compartment and operating the

22

forklift in a safe manner; Crown provided doors for the forklift at issue *only* upon special order; the majority of its customers used and wanted forklifts *without* doors; although forklifts with doors were available as substitute products, they were *not* necessarily as safe in all situations as those without doors; and Crown could *not* put a door on a forklift without impairing the forklift's safety in situations where the forklift tips over laterally or falls off a loading dock.

Judgment as a matter of law was properly granted. Guy failed to provide the requisite evidence for a MPLA feasible design alternative. Therefore, the evidence produced by Guy was not sufficient for a reasonable jury to find, *inter alia*, that the Crown forklift had a design defect that rendered the forklift unreasonably dangerous.

### III.

For the foregoing reasons, the judgment is

*AFFIRMED.*