# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

October 24, 2018

Lyle W. Cayce
Clerk

No. 17-30124

MARY SANDIFER; AMANDA SANDIFER; RYAN SANDIFER,

> Plaintiffs - Appellants

v.

HOYT ARCHERY, INCORPORATED; NATIONAL UNION FIRE
INSURANCE COMPANY OF PITTSBURGH, PENNSYLVANIA; ST. PAUL
FIRE & MARINE INSURANCE COMPANY,

> Defendants - Appellees

Appeal from the United States District Court
for the Middle District of Louisiana

Before STEWART, Chief Judge, and JOLLY and OWEN, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

This appeal arises from a most unfortunate, unintended, and unwitnessed death. Dr. Alan Sandifer was pierced in the head by the cable guard of his 2007 Hoyt Vulcan XT500 bow,[1] which he was examining, and possibly modifying, while at his home. Following his death, his family members—Mary, Amanda, and Ryan Sandifer ("the Sandifers")—filed suit

---

[1] A cable guard is a fiberglass rod that runs perpendicular from the riser—the central component of the bow where the handle is located—toward the bowstring. It keeps the cable out of the arrow's line of fire.

No. 17-30124

against Hoyt Archery, Inc. and its insurers (collectively, "Hoyt"). The Sandifers brought this action under the Louisiana Products Liability Act ("LPLA") alleging that the compound bow was defectively designed.

The determinative issue on appeal is whether the district court erred by excluding most of the testimony of the Sandifers' primary expert, Dr. Kelkar. In disallowing Dr. Kelkar's testimony, the district court held, first, that he, as a substitute expert, exceeded the scope of the expert opinion, theory, and testimony as earlier defined by the district court when allowing him to enter the case late into the litigation. Secondly, the court excluded on the grounds that Dr. Kelkar's opinion as to the causation of the accident was based on propensity evidence, relating to the character and habits of Dr. Sandifer as a hunter. Once the district court ruled on the evidentiary questions, it granted summary judgment to Hoyt on the ground that the Sandifers did not present evidence that Dr. Sandifer was engaged in a reasonably anticipated use of the bow at the time of the accident, a required showing by the LPLA.

Because we conclude that the court acted within its discretion, we AFFIRM its grant of summary judgment, dismissing the case. But first let us get to the facts of the Sandifers' claims.

I.

Dr. Sandifer was an avid bow hunter. One evening, while at home, with his wife seated in a different room, he sat at his computer with his Hoyt compound bow. His wife asked what he was doing, and he told her that he was searching the internet for a new part. A few minutes later, his wife heard a loud noise and found her husband lying unconscious on the floor with the compound bow's metal cable guard in his head through his left temple. The rod went deep into Dr. Sandifer's brain. He died the next day. No one saw the accident.

No. 17-30124

How the accident occurred is confounding and is the subject of this litigation. Hoyt, the manufacturer, contends that, when modifying the bow, Dr. Sandifer voluntarily placed his head in the bow to examine it while pulling the drawstring; then, he accidentally lost control of the string, causing the cable guard to enter his head; and that such use of the bow was not a reasonably anticipated use of the instrument. The Sandifers contend that Dr. Sandifer did not voluntarily place his head into the bow but instead that the compound bow was defective, and the defect caused the cable guard to release and enter Dr. Sandifer's brain.

This case was initially filed in the Nineteenth Judicial District Court for the State of Louisiana. Hoyt removed the case to the U.S. District Court for the Middle District of Louisiana.

After over three years of litigation, the Sandifers asked for a continuance of the trial date that had been set. Their primary expert, Dr. Gautam Ray, a biomechanical engineer, had been diagnosed with terminal cancer and could not continue in the case. The Sandifers had employed Dr. Ray to explain how the accident occurred and to show that Dr. Sandifer's use of the compound bow was a reasonably anticipated use. *See* La. Rev. Stat. 9:2800.54 (stating that a manufacturer is liable only when an injury "arose from a reasonably anticipated use of the product"). The district court had qualified Dr. Ray to testify at trial based upon the standards in *Daubert v. Merrell Dow Pharms. Inc.*; that is to say, his methods were reliable and his opinions helpful to the jury. *See* 509 U.S. 579 (1993). Further, the court had denied Hoyt's motion for summary judgment, partially because Dr. Ray testified that Dr. Sandifer's head "most probably than not" ended up between the cable guard and the bow string involuntarily.

As previously noted, because of his impaired physical condition, Dr. Ray withdrew from the case. Afterward, the Sandifers moved the district court to

3

allow Dr. Ray to be replaced with another biomechanical engineer. The court granted that request. The court admonished, however, that the approval of "a substitute expert was not an opportunity for [the Sandifers] to re-start expert discovery or engage an expert outside the scope of expertise and methodology of Dr. Ray."

The Sandifers hired Dr. Rajeev Kelkar—an accident reconstruction expert and biomechanics consultant—who worked for InSciTech, Inc., an engineering firm that specializes in the investigation and analysis of accidents and equipment failures. He concluded in his report that it was most likely that Dr. Sandifer's injury resulted from a twisting of the bow string that caused Dr. Sandifer's head to involuntarily end up between the bow string and the riser due to a design defect, rather than a volitional act on his part. The basis for this opinion, as expressed by Dr. Kelkar, was that Dr. Sandifer was a "meticulous" and "very safety conscious" bow hunter who would know not to flex his left elbow in a "biomechanically disadvantageous" manner and place his head in the bow.

After Dr. Kelkar submitted his analysis and opinion, Hoyt deposed him. At that deposition, Dr. Kelkar conceded that from a biomechanical perspective, it was just as likely that Dr. Sandifer was killed by volitionally placing his head inside the bow as it was by an accidental twisting of the bowstring. But he added that he believed the second scenario was more likely because of statements from Dr. Sandifer's friends and family describing him as a careful bow hunter and the difficulty of volitionally placing one's head into a drawn bowstring. When pressed, Dr. Kelkar conceded that, without the statements

No. 17-30124

about Dr. Sandifer's careful nature as a hunter, he could not say his theory was more likely than the expert opinion offered by Hoyt.[2]

## II.

We turn to the arguments of the parties and the rulings of the district court. First, Hoyt moved to exclude portions of Dr. Kelkar's report. Specifically, Hoyt argued that Dr. Kelkar's report exceeded the scope of Dr. Ray's expert report and that Dr. Kelkar's conclusions were based improperly on Dr. Sandifer's reputation for safety. Hoyt further moved for summary judgment.

The district court granted Hoyt's motions to exclude the challenged portions of Dr. Kelkar's expert report. In its ruling, the court first observed that Dr. Kelkar's methods and conclusions were beyond the scope of Dr. Ray's report in violation of the court's instructions when allowing the substitution of experts. Second, the court disqualified Dr. Kelkar on *Daubert* grounds. The court held that neither the Sandifers nor Dr. Kelkar demonstrated that propensity inferences were a reliable basis for an expert biomechanical opinion.[3] The court noted that "in his deposition, Dr. Kelkar admitted that but for his reliance on Dr. Sandifer's reputation for safety, he would have reached the same conclusion as . . . the Defendants' expert." In the absence of a showing from the Sandifers that experts in the field of biomechanics

---

[2] For example, when asked "So what is it that we know about Dr. Sandifer that you think makes it more likely -- or one more likely than the other?" Dr. Kelkar responded, "That [Dr. Sandifer] was a meticulous, careful, safe archer." This acknowledgement was not an isolated mistake as the Sandifers insist.

[3] The court also found such inferences to be based on inadmissible character evidence and that the evidence Dr. Kelkar sought to introduce was more prejudicial than probative. Because the court's *Daubert* holding is sufficient to settle this issue, for purposes of this opinion, we will not address these bases for the district court's holding.

routinely rely on propensity evidence,[4] the court found that it was not reasonable for a biomechanical expert to rely upon propensity evidence and excluded the portions of Dr. Kelkar's report regarding whether Dr. Sandifer volitionally placed his head in the bow while modifying it.

The Sandifers then moved the district court to reconsider its decision to exclude portions of Dr. Kelkar's report, arguing that the district court's ruling resulted in manifest injustice and constituted an improper discovery sanction. The district court denied that motion. In denying the motion, the court first explained that when it allowed the Sandifers' substitute expert, the court was clear that the Sandifers could not restart expert discovery. Furthermore, the district court reaffirmed its *Daubert* rulings excluding Dr. Kelkar's proffered expert opinion on Dr. Sandifer's use of the bow at the time of the accident.

After granting Hoyt's motions to exclude portions of Dr. Kelkar's report, the district court then granted Hoyt's motion for summary judgment. In granting summary judgment, the district court underscored that the Sandifers conceded in their motion for reconsideration that they could not carry their burden of establishing a reasonably anticipated use of the bow without the safety reputation evidence of Dr. Sandifer, which the district court had excluded. They argued, however, that this propensity evidence should be

---

[4] We use the term "propensity evidence" to refer to evidence of Dr. Sandifer's reputation and/or habit of safe practices to show that Dr. Sandifer acted in accordance with that reputation on the occasion that produced the accident. *See* PAUL F. ROTHSTEIN, FEDERAL RULES OF EVIDENCE RULE 404 (3d ed. Feb. 2018) ("Habit or routine practice, like character, describes a propensity, but it involves more regular, very specific, somewhat involuntary responses to a repeated situation."). We take no position on whether such evidence is generally inadmissible character evidence or generally admissible habit evidence. *See, e.g.*, *Reyes v. Mo. Pac. R. Co.*, 589 F.2d 791, 794–95 (5th Cir. 1979) ("Perhaps the chief difficulty in deciding questions of admissibility under Rule 406 arises in trying to draw the line between inadmissible character evidence and admissible habit evidence. Quite often the line between the two may become blurred." (citing McCormick on Evidence § 195 at 462–63 (2d ed. 1972))).

No. 17-30124

allowed because such testimony was evidence of Dr. Sandifer's habits, not a description of his personal character.  The Sandifers timely appealed.

### III.

On appeal the Sandifers make two arguments.  First they argue that the district court abused its discretion by excluding the testimony of Dr. Kelkar as beyond the scope of the Sandifers' original biomechanical expert; and moreover, excluding this testimony constituted an improper discovery sanction.  Secondly, the district court abused its discretion by excluding Dr. Kelkar's opinions based upon Dr. Sandifer's safe archery practices.  The Sandifers argue that such evidence was not impermissible character evidence, but instead the evidence is admissible as habit evidence.  Hoyt counters that the evidence was in fact character evidence and, regardless, such propensity evidence, be it character or habit, was beyond the scope of Dr. Kelkar's biomechanical expertise and formed an unreliable basis for his conclusions.

In considering the Sandifer's arguments, we need only address the district court's *Daubert* rulings relating to propensity evidence because, as we shall see, they provide a sufficient basis for the grant of summary judgment to Hoyt.

### IV.

We review a district court's exclusion of expert testimony and all discovery-related rulings for abuse of discretion.  *Munoz v. Orr*, 200 F.3d 291, 300 (5th Cir. 2000).  Because district courts have broad discretion in deciding the admissibility of expert testimony, "we will not find error unless the ruling is *manifestly erroneous.*"  *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004) (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 141–42 (1997)).  We reverse the trial court only "in 'unusual and exceptional case[s].'"  *Id.* (quoting *O'Malley v. U.S. Fid. & Guar. Co.*, 776 F.2d 494, 499 (5th Cir. 1985)).

7

No. 17-30124

As we have noted, the district court held that Dr. Kelkar's opinion relating to reasonably anticipated use did not satisfy the standards for the admissibility of expert opinion under *Daubert* because it was based upon unreliable propensity evidence. The Sandifers counter that Dr. Kelkar relied upon purely biomechanical grounds in his opinion and, alternatively, that the propensity evidence was admissible as habit evidence. Unsurprisingly, Hoyt fully defends the reasoning and conclusions of the district court. Our review of the arguments leads us to conclude that the district court did not abuse its discretion.

Under the LPLA, in order to prevail the Sandifers must prove: (1) the bow possessed an unreasonably dangerous characteristic; (2) the characteristic proximately caused injury; and (3) the injury arose from a reasonably anticipated use of the bow. La. Rev. Stat. 9:2800.54. The only issue we need to consider is whether the district court properly excluded Dr. Kelkar's opinion on the element of reasonably anticipated use. Without such testimony, the Sandifers cannot prevail.

As did the district court, we review the admissibility of expert opinions under the framework set out in *Daubert v. Merrell Dow Pharms. Inc. See* 509 U.S. at 589–95. Under *Daubert*, expert testimony is "admissible only if it is both relevant and reliable." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002). To establish reliability an expert opinion must "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999). Finally, "the party seeking to have the district court admit expert testimony must demonstrate that the expert's findings and conclusions are based on the scientific method and, therefore, are reliable." *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc). The district court observed that the Sandifers "do not contend that habit or character evidence is

8

the type of evidence reasonably relied upon in rendering a biomechanical engineering opinion."[5]  On appeal, the Sandifers have provided us with no reason to doubt this statement.  Indeed, Dr. Kelkar admitted in his deposition that his statements based upon evidence of "Dr. Sandifer's habits as an individual" are not "biomechanical opinions."[6]

Apart from exceeding the scope of his qualification as a biomechanical expert, the propensity evidence Dr. Kelkar based his opinion upon is not a reliable basis to draw a conclusion regarding Dr. Sandifer's use of the bow at the time of the accident.  The propensity evidence was offered by witnesses who testified that Dr. Sandifer was safety-conscious in using and handling the bow as a hunter and when hunting.  Dr. Sandifer was not hunting when the accident occurred; he was in his home office and he was engaged in modifying his bow.  This distinction further shows that the district court did not err in finding that an analysis drawn from these propensity statements was not helpful to the specific issues before the jury.

---

[5] In their motion for reconsideration of the *Daubert* ruling, the Sandifers disputed this characterization of their position but did not point to anything in the record indicating that biomechanical experts rely upon character or habit evidence.

[6] From Dr. Kelkar's deposition:

> Q: So what is it that we know about Dr. Sandifer that you think makes [Dr. Kelkar's theory more likely than Hoyt's theory]?
>
> A: That he was a meticulous, careful, safe archer. . . . That he, you know, did this as a passion and seemed to be doing very well, would not do anything remotely like this in terms of volitionally putting his head in the way between the cable guards and a string.
>
> Q. Okay.  And you would agree that all of those things that you just talked about -- about Dr. Sandifer's habits as an individual, being meticulous and safety conscious and all of that -- those are not biomechanical opinions?
>
> A: No. . . . They're not.  But it's part of what I have to consider when I review the material.

No. 17-30124

We should make clear that Dr. Kelkar relies on this propensity evidence to establish causation throughout his report and deposition testimony. His report cites Dr. Sandifer's "careful, meticulous" nature multiple times. When pressed on this point, Dr. Kelkar acknowledged several times that it was Dr. Sandifer's propensity to handle the bow as a "meticulous, careful, safe archer" that allowed him to conclude that his nonvolitional theory was more likely than Hoyt's volitional theory. To be sure, an expert may rely upon otherwise inadmissible facts and data if "'experts in the particular field would reasonably rely on such evidence.'" *Daubert*, 509 U.S. at 595 (quoting Fed. R. Evid. 702).[7] Here, however, the Sandifers and Dr. Kelkar present no reason to doubt the district court's finding that experts in the field of biomechanics do not rely upon such propensity evidence in forming their professional opinions. *Cf. Moore*, 151 F.3d at 276 ("The proponent need not prove to the judge that the expert's testimony is correct, but she must prove by a preponderance of the evidence that the testimony is reliable."). Thus, it seems quite clear that the district court was within the realm of its discretion to conclude that it would be improper to "invite the jury to rely on expert opinion consisting of conclusions based partly on generally inadmissible propensity evidence." *Travis v. State Farm & Cas. Co.*, 2005 U.S. Dist. LEXIS 49957 (M.D. La. Dec. 23, 2005); *see also Moore*, 151 F.3d at 278 (noting that "'[u]nder the regime of *Daubert* a district judge asked to admit scientific evidence must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation

---

[7] The Sandifers argue that the evidence of Dr. Sandifer's careful nature is properly characterized as admissible habit evidence. The proper frame of reference here is Rules 701–703, not Rule 406. Nobody doubts that experts may rely on otherwise inadmissible evidence if such evidence is relied upon by experts in the field. The question here is the *reliability* of Dr. Kelkar's methods. It is immaterial to our analysis whether the propensity evidence is characterized as habit or character. What matters is that such evidence is not a reliable basis for a biomechanical expert opinion.

offered by a genuine scientist." (quoting *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 318 (7th Cir. 1996))).

With the unreliable portions excluded, Dr. Kelkar's opinion as to causation of the accident becomes ambivalent and is of no help to the jury in sorting out a reliable explanation of how the accident occurred. Without the benefit of the propensity evidence, Dr. Kelkar can only conclude that his theory is as likely as the defense theory. An expert opinion must "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702; *see also Pipitone*, 288 F.3d at 245 ("A perfectly equivocal opinion does not make any fact more or less probable and is irrelevant under the Federal Rules of Evidence."); *Brown v. Parker-Hannifin Corp.*, 919 F.2d 308, 311–12 (5th Cir. 1990). For example, in *Pipitone v. Biomatrix, Inc.* we held that the district court properly excluded an expert who testified that he had no "scientific evidence" to support his conclusion that it was more likely than not that an infection occurred in a certain way:

> Dr. Millet's testimony on causation is not helpful to the fact-finder because of his inability to conclude that it was more likely than not that the Synvisc caused the infection in Pipitone's knee. A perfectly equivocal opinion does not make any fact more or less probable and is irrelevant under the Federal Rules of Evidence. Therefore, the district court did not abuse its discretion in excluding Dr. Millet's testimony.

288 F.3d at 245. So too here. Dr. Kelkar testified that "biomechanically" Hoyt's volitional theory was just as likely as his own theory. Thus, Dr. Kelkar's opinion, without the propensity evidence, could not help the jury decide whether Dr. Sandifer was engaged in reasonably anticipated use of the bow when the accident occurred. The district court did not abuse its discretion in excluding Dr. Kelkar's "perfectly equivocal opinion." *Id.*

In sum, the burden was on the Sandifers to show how the accident occurred. Their biomechanical expert admits that his biomechanical opinion

is just as likely as Hoyt's biomechanical theory.  His only response to Hoyt's theory is based on unscientific and unhelpful propensity evidence that is not reasonably relied upon by experts in the biomechanical field and consequently fails to satisfy *Daubert*'s requirements for the admissibility of expert opinion. The Sandifers thus fail in their burden to show that Dr. Sandifer was engaged in a reasonably anticipated use of the bow at the time of the accident. Summary judgment was appropriate, and the judgment of the district court is

AFFIRMED.