# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 18-31074

United States Court of Appeals
Fifth Circuit

**FILED**

October 28, 2020

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff–Appellee,

v.

SHELTON BARNES; MICHAEL JONES; HENRY EVANS; PAULA JONES; GREGORY MOLDEN, M.D.,

Defendants–Appellants.

―――――――――

Appeal from the United States District Court
for the Eastern District of Louisiana

―――――――――

Before OWEN, Chief Judge, and HAYNES and COSTA, Circuit Judges.

PRISCILLA R. OWEN, Chief Judge:

Shelton Barnes, Michael Jones, Henry Evans, Paula Jones, and Gregory Molden were convicted of offenses related to Medicare fraud.  We affirm.

**I**

Dr. Shelton Barnes, Dr. Michael Jones, Dr. Henry Evans, Paula Jones, and Dr. Gregory Molden were each previously employed by Abide Home Care Services, Inc., a home health agency owned by Lisa Crinel.  Barnes, Michael Jones, Evans, and Molden served as "house doctors."  In that role, the physicians referred patients to Abide for home health care services.  Paula Jones, Michael Jones's wife, was one of Abide's billers.  As a biller, Jones would process Medicare filings.  She would use the Kinnser billing system (Kinnser)

to ensure that all appropriate documentation existed for each bill. As part of Abide's business model, it would "provide home health services to qualified patients and then bill Medicare accordingly."

Medicare reimburses providers for home health care services if a particular patient is (1) eligible for Medicare and (2) meets certain requirements. Those requirements include, *inter alia*, that the patient is "'homebound,' under a certifying doctor's care, and in need of skilled services."[1] Certifying a patient for home health care begins with an initial referral, which typically originates with the patient's primary care physician.[2] Next, "a nurse goes to the patient's home to assess if [he or] she is homebound, completing an Outcome and Assessment Information Set [(OASIS)]."[3] From the OASIS assessment, the nurse develops a plan of care on a form known as a "485" for the prescribing physician's review. Only a physician can approve a 485 plan. Physicians are expected to review the forms to ensure they are accurate. These forms, as well as a face-to-face addendum certifying that the nurse met with the patient, are then routed to Medicare.[4] This process permits payment for one 60-day episode. Patients can then be recertified for subsequent episodes.

Medicare determines how much will be paid for each episode based, in part, on the patient's diagnosis. Each diagnosis has a corresponding code derived from the International Statistical Classification of Diseases and Related Health Problems 9th Revision (an ICD-9 code). Reimbursements are higher for some diagnoses than others. So-called "case-mix diagnoses" such as rheumatoid arthritis, cerebral lipidosis, and low vision, receive higher payments than other, comparatively simpler diagnoses. As a result, false or

---

[1] *United States v. Ganji*, 880 F.3d 760, 777 (5th Cir. 2018).
[2] *Id.* at 764.
[3] *Id.*
[4] *Id.*

No. 18-31074

erroneous entries on the OASIS form can ultimately result in higher Medicare reimbursements.

The government came to suspect that Abide was committing health care fraud. Specifically, the government alleged that "Abide billed Medicare based on plans of care that doctors authorized for medically unnecessary home health services." According to the government, several patients who had received home health care from Abide did not, in fact, need such services. Each physician had "approved [case-mix] diagnoses to patients on . . . 485s that were medically unsupported." Paula Jones had also participated in the scheme. Through Kinnser, Abide employees were able to predict how much Medicare would reimburse for a particular episode of home health care. If the episode did not meet Abide's "break-even point," Jones would send "the files back to the case managers to see if they could get the score up." These and other actions "fraudulently inflated Medicare's reimbursement to Abide."

Relatedly, the government also came to suspect that Abide was "pay[ing] doctors, directly or indirectly, for referring patients." The government alleged that Crinel (the owner of Abide) had paid the physicians for patient referrals. Some of these payments were "disguised as compensation for services performed as [medical directors]" for Abide. The government also alleged that Paula Jones's salary, which had doubled during her time working for Abide, was based on her husband's referrals. This conduct, the government alleged, constituted a violation of 42 U.S.C. §§ 1320a-7b(b)(1), (b)(2)—the anti-kickback statute.

Barnes, Michael Jones, Evans, Paula Jones, and Molden were each charged with conspiracy to commit health care fraud and conspiracy to violate the anti-kickback statute. Each physician was also charged with several counts of substantive health care fraud. Finally, Barnes was charged with obstructing a federal audit in violation of 18 U.S.C. §§ 2 and 1516. According

3

to the government, upon learning he was under audit, Barnes falsified documents to justify his fraudulent certifications.

At trial, Crinel, Wilneisha Jakes (Crinel's daughter and an Abide employee), Rhonda Maberry (an assistant manager at Abide), and Eleshia Williams (Barnes's biller) testified for the government. Dr. Lutz also testified for the government. He evaluated the medical records of several of Abide's patients and opined as to whether home health care was medically necessary. The defendants presented several witnesses; Evans also testified in his own defense. The jury convicted Barnes, Michael Jones, Paula Jones, and Molden of conspiracy to commit health care fraud and conspiracy to violate the anti-kickback statute. Barnes, Evans, Michael Jones, and Molden were each found guilty of several counts of substantive health care fraud. The jury also convicted Barnes of obstructing a federal audit. Thereafter, each was sentenced to a term of imprisonment. This appeal followed.

## II

We first consider the issues raised by Shelton Barnes.

### A

Barnes challenges the sufficiency of the evidence supporting each of his convictions. "[P]reserved sufficiency-of-the-evidence challenges" are reviewed de novo.[5] Under that standard, "we review[ ] the record to determine whether, considering the evidence and all reasonable inferences in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[6]

---

[5] *United States v. Gibson*, 875 F.3d 179, 185 (5th Cir. 2017) (citing *United States v. Davis*, 735 F.3d 194, 198 (5th Cir. 2013)).

[6] *Id.* (alteration in original) (quoting *United States v. Vargas-Ocampo*, 747 F.3d 299, 303 (5th Cir. 2014) (en banc)); *see also United States v. Grant*, 683 F.3d 639, 642 (5th Cir. 2012) ("'The evidence need not exclude every reasonable hypothesis of innocence or be wholly

No. 18-31074

**1**

Barnes was convicted on both counts of conspiracy identified in the indictment. Count 1 alleged that he conspired to commit healthcare fraud, in violation of 18 U.S.C. §§ 1347 and 1349. Section 1347 punishes "[w]hoever knowingly and willfully executes, or attempts to execute, a scheme or artifice . . . to defraud any health care benefit program . . . in connection with the delivery of or payment for health care benefits, items, or services."[7] To convict on Count 1, the government was required to prove: "(1) two or more persons made an agreement to commit health care fraud; (2) the defendant knew the unlawful purpose of the agreement; and (3) the defendant joined in the agreement willfully, that is, with the intent to further the unlawful purpose."[8]

Count 2 alleged that Barnes conspired with others to "knowingly and willfully solicit and receive . . . kickbacks and bribes . . . in return for referring individuals for" Medicare services in violation of 42 U.S.C. §§ 1320a-7b(b)(1), (b)(2), and 18 U.S.C. § 371. As summarized in *United States v. Gibson*, the anti-kickback statute "criminalizes the payment of any funds or benefits designed to encourage an individual to refer another party to a Medicare provider for services to be paid for by the Medicare program."[9] To convict on Count 2, the government was required to establish: "(1) an agreement between two or more persons to pursue [the] unlawful objective; (2) the defendant's knowledge of the unlawful objective and voluntary agreement to join the

---

inconsistent with every conclusion except that of guilt,' in order to be sufficient." (quoting *United States v. Moreno*, 185 F.3d 465, 471 (5th Cir. 1999))).

[7] 18 U.S.C. § 1347(a).

[8] *Gibson*, 875 F.3d at 185-86 (footnote omitted) (citing *United States v. Willett*, 751 F.3d 335, 339 (5th Cir. 2014)).

[9] *Id.* at 187 (quoting *United States v. Miles*, 360 F.3d 472, 479 (5th Cir. 2004)).

conspiracy; and (3) an overt act by one or more of the members of the conspiracy in furtherance of the objective of the conspiracy."[10]

The *sine qua non* of a conspiracy is an agreement.[11] We have previously recognized that "[a]greements need not be spoken or formal."[12] "[T]he [g]overnment can use evidence of the conspirators' concerted actions to prove an agreement existed."[13] Nevertheless, "[p]roof of an agreement to enter a conspiracy is not to be lightly inferred."[14] "'Mere similarity of conduct among various persons and the fact that they have associated with or are related to each other' is insufficient to prove an agreement."[15] "Conspirators do not enter into an agreement by happenstance . . . ."[16]

On appeal, Barnes relies heavily on our previous decision in *United States v. Ganji* in arguing that there was insufficient evidence to convict him of either conspiracy. In *Ganji*, Elaine Davis, the owner of a home health care agency, and Dr. Ganji, a physician associated with Davis's agency, were charged and ultimately convicted of conspiracy to commit health care fraud and substantive health care fraud.[17] We reversed on sufficiency-of-the-evidence grounds.[18] As to each conspiracy conviction, we concluded the government failed to establish either individual entered into an agreement to commit health care fraud.[19] Unlike "the vast majority of concert of action cases," the government did not produce an "insider" who could testify as to

---

[10] *Id.* at 187-88 (quoting *United States v. Njoku*, 737 F.3d 55, 64 (5th Cir. 2013)).

[11] *See United States v. Ganji*, 880 F.3d 760, 767 (5th Cir. 2018).

[12] *Id.*

[13] *Id.*

[14] *Id.* (alteration in original) (quoting *United States v. Johnson*, 439 F.2d 885, 888 (5th Cir. 1971)).

[15] *Id.* at 767-68 (quoting *United States v. White*, 569 F.2d 263, 268 (5th Cir. 1978)).

[16] *Id.* at 768.

[17] *Id.* at 764-66.

[18] *Id.* at 778.

[19] *Id.* at 773.

either Dr. Ganji's or Davis's involvement in the alleged conspiracy.[20] Moreover, "[t]he quality and probative strength of the [g]overnment's 'concerted action' evidence in [*Ganji* fell] well short of the [requisite] threshold."[21] As to the substantive health care fraud convictions, we concluded "there [was] insufficient evidence to show that [either individual] *knowingly* executed a scheme to defraud Medicare."[22] According to Barnes, "[t]he facts described [in *Ganji*] are practically identical, or more than substantially so, to the facts brought out at trial." We disagree.

As to Count 1, Maberry testified to signing Barnes's name on 485s, and to certifying falsely that patients were under Barnes's care. The jury heard evidence that Barnes was aware of this conduct. Moreover, Crinel testified that Barnes was paid for patient referrals, which established a potential motive for Barnes's conduct. Importantly, Crinel had also pleaded guilty to conspiring with Barnes to commit health care fraud. Finally, the government presented statistical evidence reflecting that Barnes billed for case-mix diagnoses with significantly greater frequency than other providers in Louisiana and the country as a whole. As the district court noted, the numbers are significantly different such that they are "too large to have happened by chance." Collectively, this evidence more than sufficiently establishes the elements of conspiracy.

Regarding Count 2, Wilneisha Jakes's and Crinel's testimony provide sufficient evidence of a conspiracy to violate the anti-kickback statute. During Jakes's testimony, she admitted that: (1) Barnes was paid for patient referrals; (2) his employment agreement was created merely to establish a paper trail; and (3) she entered into an agreement with Barnes to pay him for his referrals.

---

[20] *Id.* at 771.
[21] *Id.* at 770; *see id.* at 773.
[22] *Id.* at 778 (emphasis added).

No. 18-31074

Likewise, Crinel testified that Barnes was being paid for patient referrals. As with Count 1, because she pleaded guilty to conspiring with Barnes to violate the anti-kickback statute, her testimony regarding Barnes's role in the conspiracy was especially probative.

Of course, Barnes's case bears some similarities to *Ganji*. But we strongly disagree with his assessment that his case is "practically identical, or more than substantially so," to *Ganji*. Perhaps the most significant difference is the fact that this case is one of "the vast majority of concert of action cases[] [in which] the [g]overnment presents an insider with direct evidence of the conspiratorial scheme."[23]

**2**

Counts 3 through 17 each alleged a separate violation of 18 U.S.C. § 1347. Counts 3 through 7 concerned patient HaHa; Counts 8 through 10 concerned patient KiSt; and Counts 11 through 17 concerned patient ArGi.

Barnes again relies on *Ganji*, and specifically this court's recognition that to convict a physician of violating 18 U.S.C. § 1347 the prosecution "must provide evidence that the accused doctor executed a fraudulent scheme with *knowledge* that the patient was not homebound."[24] According to Barnes, his convictions should be overturned because the government did not produce one scintilla of evidence that Barnes "*knew* [HaHa, KiSt, or ArGi were] not homebound."[25]

Despite Barnes's contentions, the government presented sufficient evidence that Barnes knew these patients were not home-health-care eligible. Maberry, Barnes's nurse practitioner, told him that not all of the patients he certified as homebound were, in fact, homebound. Moreover, the substantial

---

[23] *Id.* at 771.
[24] *Id.* at 777 (emphasis added).
[25] *Id.* at 778.

8

No. 18-31074

evidence presented as to Counts 1 and 2 undermines Barnes's argument. Evidence of a financial incentive for home health care referrals and statistical evidence probative of fraudulent conduct are circumstantial evidence of Barnes's knowledge.

Specific evidence relating to each patient reinforces this conclusion. As to patient HaHa, Maberry testified that HaHa's billings lacked appropriate supporting documentation. Dr. Lutz testified that HaHa did not know Barnes and that several of HaHa's diagnosis codes were "shuffled" during recertifications. As to patient KiSt, Barnes lacked records for this patient, and he never met with her. Maberry, who pleaded guilty to conspiring with Barnes to commit Medicare fraud regarding KiSt's home health certification, testified that 485s had been pre-signed before visiting KiSt. Lastly, as to patient ArGi, Dr. Lutz testified that Barnes's patient files for ArGi lacked the documentation that should have existed if ArGi had the conditions Barnes alleged ArGi had. Also, Maberry signed Barnes's signature on several of the relevant 485s identified in the indictment. In the aggregate, this evidence is more than sufficient for a reasonable juror to conclude that Barnes's conduct was fraudulent.

**3**

We next consider Barnes's conviction for obstructing a federal audit in violation of 18 U.S.C. §§ 2 and 1516. Section 1516 provides the following:

> Whoever, with intent to deceive or defraud the United States, endeavors to influence, obstruct, or impede a Federal auditor in the performance of official duties relating to a person, entity, or program receiving in excess of $100,000, directly or indirectly, from the United States in any 1 year period under a contract or subcontract, grant, or cooperative agreement, . . . shall be fined under this title, or imprisoned not more than 5 years, or both.[26]

---

[26] 18 U.S.C. § 1516(a).

No. 18-31074

On appeal, Barnes raises two arguments as to why his conviction as to Count 47 should be reversed.

Barnes's first argument concerns § 1516's jurisdictional element, which specifically requires that the conduct in question be directed at "a Federal auditor in the performance of official duties relating to a person, entity, or program receiving in excess of $100,000, directly or indirectly, from the United States in any 1 year period."[27]   Under his proposed interpretation of the statute, § 1516 can only apply if *he* received "in excess of $100,000 . . . from the United States in any 1 year period."[28]   Thus, because no such evidence was adduced at trial, he is entitled to an acquittal.  The government disagrees and instead argues Barnes's conviction should be affirmed because *Medicare* received in excess of $100,000 from the United States.

Reviewing this question of statutory interpretation de novo, we are inclined to side with the government.[29]   Under a plain-text reading of the statute, it is telling that an individual violates § 1516 when he or she "endeavors to influence, obstruct, or impede a Federal auditor in the performance of official duties *relating* to a person, entity, or program receiving in excess of $100,000 . . . from the United States."[30]   In this case, the audit was undoubtedly *related* to Medicare, a "program receiving in excess of $100,000 . . . from the United States."[31]   Further, we are not convinced that Barnes's alternative interpretation represents a better reading of the statute.  Under his interpretation, the amount of money received by an alleged violator would often be the statute's limiting criterion.  Such a result would inherently

---

[27] *Id.*

[28] *Id.*

[29] *United States v. Ridgeway*, 489 F.3d 732, 734 (5th Cir. 2007) (citing *United States v. Phillips*, 303 F.3d 548, 550 (5th Cir. 2002)).

[30] 18 U.S.C. § 1516(a) (emphasis added).

[31] *Id.*

thwart Congress's intentions when it comes to enforcing the statute. We therefore decline to adopt Barnes's proposed reading of § 1516's jurisdictional element. Because there was sufficient evidence to establish § 1516's jurisdictional element under the interpretation we adopt today, we reject Barnes's first argument concerning Count 47.

Next, Barnes contends there was insufficient evidence he engaged in obstructive conduct. But the jury heard evidence that Barnes received several letters from Medicare indicating that he would not be paid for certain Medicare billings because the billings lacked the appropriate documentation. Thereafter, he gave over fifty audit letters to Maberry, his nurse practitioner. He then informed her that they had "received the audit, and in order for him to get paid[, they] had to complete that audit for Medicare." In response, Maberry and Eleshia Williams, Barnes's biller, completed paperwork in order to justify these billings. Some documents were falsified to do so. Both Maberry and Williams testified that Barnes was aware of these actions. According to Maberry, Barnes had implied that they should take such actions. Moreover, she testified that she falsified, and Barnes signed, care plan log sheets in response to the audit. Williams noted that Barnes had observed and tacitly approved of Maberry signing his name on medical documentation as part of the audit.

We agree with the government that logical and reasonable inferences from this evidence would enable a reasonable juror to conclude that Barnes acted "with intent to deceive or defraud the United States,"[32] as required by § 1516(a), or that he acted "with the intent to facilitate" the offense's commission, as required by § 2.[33]

---

[32] *Id.*

[33] *See Rosemond v. United States*, 572 U.S. 65, 70-71 (2014) (quoting *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 181 (1994)).

No. 18-31074

**B**

Barnes asserts that the prosecutor made improper comments during closing arguments. During those arguments, Paula Jones's attorney challenged the credibility of Dr. Lutz, the government's expert witness. Specifically, her attorney stated:

> Dr. Lutz may not be going where his grandfather was going. His grandfather may go to church, Dr. Lutz goes to Galatoire's. There's a big difference. When I listen to him, it was almost like an aristocratic arrogance of saying, okay, we have all these problems in New Orleans, but I'm going to be at Galatoire's and I'm going to write out a big prescription -- Weight Watchers for everybody. That's going to solve all our problems, as he takes another sip of his martini. That's an aristocratic arrogance. Never seen the patients, never go down to the areas of the city that need it.

The reference to Galatoire's, a restaurant in the French Quarter, stemmed from Dr. Lutz's testimony during trial that he does not eat at Galatoire's on Fridays during lunch because "[t]here's too many attorneys" there.

The government responded to the defense's comments during their rebuttal argument. The prosecutor specifically stated:

> He is not an elitist. He worked for the City of New Orleans when these defendants, these elite defendants probably weren't out of medical school. He worked for the City of New Orleans in home health for the inner city. So that's offensive that this man can't go out and have a martini at a place he said he did. Well, he won't because these defense attorneys are there.

The defense objected to the remarks at a bench conference, but the court did not take any action. The court did note during post-trial motions that such comments were "improper." However, it went on to state that no action was necessary because "the jury was presented with abundant evidence of [Barnes's] guilt" and the comments were but a small part of a long trial.

On appeal, Barnes alleges the prosecutor's comments were "offensive and inflammatory." He argues the comments invoked class-stereotypes by

12

referring to the defendants as elitist and impugned the integrity of defense counsel. According to him, the comments were "so wrong[] that speculation on whether it had an impact on the jury need not be suggested." We agree the comments were improper but believe such comments did not affect Barnes's substantial rights. We therefore decline his request for a new trial.

We apply a two-step process when evaluating the propriety of a prosecutor's comments during closing arguments. First, this court "initially decide[s] whether . . . the prosecutor made an improper remark."[34] "Second, '[i]f an improper remark was made, we must then evaluate whether the remark affected the substantial rights of the defendant.'"[35] Courts consider "(1) the magnitude of the prejudicial effect of the prosecutor's remark, (2) the efficacy of any cautionary instruction by the judge, and (3) the strength of the evidence supporting the conviction."[36] De novo review applies to the first inquiry.[37] In contrast, "the question of whether . . . the defendant's substantial rights were affected [is reviewed] under the abuse of discretion standard."[38]

As to the first part of the analysis, the district court correctly held that the prosecutor's comments were improper. The prosecutor's description of the defendants as elitists was arguably in response to the defense's initial attacks against Dr. Lutz. But even assuming that comment was appropriate, no similar justification validates the prosecution's comments aimed at defense counsel. Attacking defense counsel was unwarranted, unprovoked, and

---

[34] *United States v. McCann*, 613 F.3d 486, 494 (5th Cir. 2010) (quoting *United States v. Gallardo-Trapero*, 185 F.3d 307, 320 (5th Cir. 1999)).

[35] *Id.* (alteration in original) (quoting *Gallardo-Trapero*, 185 F.3d at 320).

[36] *United States v. Bennett*, 874 F.3d 236, 254 (5th Cir. 2017) (quoting *United States v. Weast*, 811 F.3d 743, 752 (5th Cir. 2016)).

[37] *McCann*, 613 F.3d at 494.

[38] *Id.*

irrelevant.    The district court therefore correctly concluded that the prosecution's remarks during rebuttal were improper.

Nevertheless, these comments did not affect Barnes's substantial rights. Viewed in context, the comments were not overly prejudicial and were unlikely to inflame the passions of the jury.[39]  Moreover, these comments were but a small part of a significant trial.  Admittedly, the judge did not provide a specific curative instruction concerning the prosecutor's comments.  Yet the case against Barnes was strong.  As the district court aptly stated, "it strains credulity to argue that this offhand comment—a few seconds in a four-week trial—had a prejudicial impact on [Barnes's] substantial rights."  We therefore decline Barnes's request for a new trial as a result of the prosecutor's improper comments during closing arguments.

## C

Barnes challenges the district court's refusal to admit patient consent forms into evidence.  Dr. Lutz testified as an expert for the government that several patients treated by the physicians in this case "had no business being in home health."  During Dr. Lutz's testimony, Barnes sought to introduce consent forms "signed by patients KiSt, HaHa[,] and ArGi in which those patients acknowledge they are homebound."  The district court refused to admit this evidence.  It concluded that: (1) the forms constituted hearsay that was inadmissible under Rule 803(4) (medical records exception) or Rule 807 (residual exception); (2) the forms were inadmissible "under Rules 703 or 705, as Dr. Lutz did not rely on the documents in forming his opinion, and did not use the documents as underlying facts or data;" and (3) the evidence was

---

[39] *See United States v. Phea*, 755 F.3d 255, 267-68 (5th Cir. 2014).

inadmissible even for impeachment purposes because the forms "were not prior inconsistent statements by Dr. Lutz."

On appeal, Barnes contends these documents were admissible hearsay and were admissible for the purposes of impeaching Dr. Lutz's testimony. We review "evidentiary rulings for abuse of discretion."[40] "A district court abuses its discretion when its ruling is based on an erroneous view of the law or a clearly erroneous assessment of the evidence."[41] If the district court did abuse its discretion, any resulting error is "subject to harmless error review."[42] "A reversal will not be warranted unless the defendant shows 'that the district court's ruling caused him substantial prejudice.'"[43] Applying this framework, the district court did not abuse its discretion when it refused to admit the consent forms into evidence.

First, the forms were inadmissible as hearsay evidence. The evidence did not qualify for admission under Rule 803(4). That exception requires that the statements be "made for—and [are] reasonably pertinent to—medical diagnosis or treatment."[44] Here, though, the statements (i.e., the forms) address criteria for home health care, not a specific medical diagnosis or treatment. The forms were also inadmissible under Rule 807 because they lacked indicia of reliability:[45] As the district court noted, "the nurses who signed the forms [or provided them to the patients for their signature] either pleaded guilty to health care fraud or were otherwise implicated in the fraud."

---

[40] *United States v. Gluk*, 831 F.3d 608, 613 (5th Cir. 2016) (citing *United States v. El-Mezain*, 664 F.3d 467, 494 (5th Cir. 2011)).

[41] *Williams v. Manitowoc Cranes, L.L.C.*, 898 F.3d 607, 615 (5th Cir. 2018) (quoting *Heinsohn v. Carabin & Shaw, P.C.*, 832 F.3d 224, 233 (5th Cir. 2016)).

[42] *Gluk*, 831 F.3d at 613 (citing *El-Mezain*, 664 F.3d at 494).

[43] *El-Mezain*, 664 F.3d at 494 (quoting *United States v. Bishop*, 264 F.3d 535, 546 (5th Cir. 2001)).

[44] FED. R. EVID. 803(4).

[45] *See* FED. R. EVID. 807.

No. 18-31074

Second, the evidence was inadmissible under Rules 703 and 705 because Dr. Lutz did not rely on those forms in making his opinion.[46]  Finally, the forms were inadmissible as prior inconsistent statements.  As the district court noted, the patients made the statements (i.e., filled out and signed the forms), not Dr. Lutz.  Because Dr. Lutz did not originally make the statements, they could not be used to impeach his credibility.[47]

Having addressed and rejected each of Barnes's arguments as to why the patient consent forms were admissible, we express no further opinion as to whether the forms may have been admissible under any other legal theory.[48]  Accordingly, the district court did not abuse its discretion when it refused to admit the proffered consent forms into evidence.

## D

At trial, Barnes sought to have several Medicare regulations read to the jury as instructions.  These regulations covered a variety of topics, including, *inter alia*, (1) a list of services available to patients eligible for home health care, (2) the certification requirements necessary for a patient to receive home health care, (3) permissible financial relationships between physicians and health care agencies, and (4) Medicare's guidance concerning the frequency of face-to-face meetings between physicians and their home-health patients.

The district court ultimately declined to read those instructions to the jury.  It was "particularly concerned about committing error by instructing the

---

[46] *See* FED. R. EVID. 703, 705.

[47] *See* FED. R. EVID. 613(b) ("Extrinsic evidence of a *witness's* prior inconsistent statement is admissible only if the *witness* is given an opportunity to explain or deny the statement and an adverse party is given an opportunity to examine the *witness* about it, or if justice so requires." (emphasis added)).

[48] *See Grogan v. Kumar*, 873 F.3d 273, 277 (5th Cir. 2017) ("[T]his court typically 'will not consider evidence or arguments that were not presented to the district court for its consideration . . . .'" (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 (5th Cir. 1992))).

jury on the meaning of the Medicare regulations in a criminal trial," relying heavily on this court's decision in *United States v. Christo*.[49] In *Christo*, the prosecution presented "evidence and argument concerning violations of [a civil regulatory statute]"[50] during a criminal trial focusing on "misapplication of bank funds."[51] We reversed the defendant's convictions after noting the prejudicial effect of "bootstrap[ping] a series of . . . civil regulatory violation[s]" into a criminal trial.[52] "The trial court's instructions and emphasis on [the civil regulatory statute]," we noted, "served only to compound the error by improperly focusing the jury's attention to the prohibitions of [the civil regulatory statute]."[53] Concluding that *Christo* controlled, the trial judge here refused to read Barnes's requested instructions. Importantly, though, the substance of those instructions was brought to the jury's attention numerous times. The actual Medicare regulations upon which the proposed instructions were based "were admitted into evidence without objection and provided to the jury." The judge also permitted defense counsel to argue the substance of these instructions during closing arguments.

On appeal, Barnes asserts the district court erred when it refused to read the proffered instructions. According to him, "[j]ust having these complex regulations used and battered about during the trial, when they formed the heart and soul of the defense, was not adequate." The judge, as a neutral and detached party, should have provided the jury with guidance on these regulations. Moreover, he argues the district court's reliance on *Christo* was inappropriate. Unlike in *Christo*, "the government [in this case was not] attempting to use regulations to sustain its burden of proof." *Christo* is

---

[49] 614 F.2d 486 (5th Cir. 1980).
[50] *Id.* at 492.
[51] *Id.* at 488.
[52] *Id.* at 492.
[53] *Id.*

distinguishable, Barnes asserts, because in this case the defense requested the instruction. Thus, in Barnes's estimation, the district court's refusal to provide the requested instructions constitutes error.

There is no error in the district court's refusal to read the proffered instructions to the jury. "Whe[n], as here, the defense requested a jury instruction and the request was denied, we review the denial for abuse of discretion."[54] "A district court abuses its discretion by failing to issue a defendant's requested instruction if the instruction (1) is substantively correct; (2) is not substantially covered in the charge given to the jury; and (3) concerns an important point in the trial so that the failure to give it seriously impairs the defendant's ability to present effectively a particular defense."[55]

We assume without deciding that the proffered instructions were "substantively correct" and "not substantially covered in the charge given to the jury."[56] Nevertheless, the refusal to read the instructions did not impair Barnes's "ability to present effectively a particular defense."[57] As the district court outlined, the jury was amply aware of the Medicare regulations and their importance to this case. The district court also properly relied on *Christo*. It is not difficult to imagine a jury confusing the standards articulated in the Medicare regulations with the appropriate legal standard in a criminal case. These risks are present irrespective of whether the government or the defense requests these types of instructions. We express no opinion whether it would have constituted an abuse of discretion if the judge had actually read the proffered instruction at the defense's behest. But given the wide latitude

---

[54] *United States v. Bennett*, 874 F.3d 236, 242 (5th Cir. 2017) (quoting *United States v. Bowen*, 818 F.3d 179, 188 (5th Cir. 2016) (per curiam)).

[55] *Id.* at 242-43 (internal quotation marks omitted) (quoting *United States v. Sheridan*, 838 F.3d 671, 672-73 (5th Cir. 2016)).

[56] *Id.* at 243 (quoting *Sheridan*, 838 F.3d at 673).

[57] *Id.* (quoting *Sheridan*, 838 F.3d at 673).

district courts have to effectively preside over criminal trials, we conclude the district court did not abuse its discretion in this case when it refused to read Barnes's proffered instructions to the jury.

## III

Michael Jones contends there was insufficient evidence to convict him of conspiracy to commit health care fraud (Count 1), conspiracy to violate the anti-kickback statute (Count 2), and seven counts of substantive health care fraud (Counts 18 and 22 through 27). Count 18 alleged fraud concerning patient ArGi; Counts 22 through 26 concerned patient LiSc; and Count 27 concerned patient EvLa.

## A

Jones asserts many of the same arguments as his co-defendants and likewise relies heavily on *Ganji*. As to Count 1, the circumstantial evidence offered against Jones was sufficient to convict him of conspiracy to commit health care fraud. Like many of the other defendants, Jones had a financial incentive to refer patients to home health care. From this evidence, the jury could reasonably infer that Jones had a motive to falsify health care certifications. Statistical evidence reflected that Jones diagnosed patients with certain conditions significantly more often than other doctors. The jury also heard substantial evidence that Jones himself certified patients for home health care even when those patients were ineligible for such services. Finally, Crinel pleaded guilty to conspiring with Jones to commit health care fraud. Together, this evidence is far stronger than that presented in *Ganji*; it is more than enough to find Jones guilty of conspiracy to commit health care fraud.

Similarly, the record contains ample evidence that Jones agreed to violate the anti-kickback statute. Crinel's testimony alone suffices. According to Crinel, Jones told her that if she increased Paula Jones's salary, "he would send patients to substantiate her salary being increased." From this

testimony, the jury was more than justified in finding Jones guilty of conspiracy to violate the anti-kickback statute.

## B

As to whether there was insufficient evidence to find him guilty on Counts 18 and 22 through 27, Jones does not appear to contest that the patient named in each count was ineligible for home health services. Instead, he contends there was insufficient evidence he *knew* the patients were ineligible when he certified them for such services, thereby preventing him from being convicted of health care fraud.

However, the previously addressed statistical evidence and his financial motive to falsify certifications are both circumstantial proof of knowledge. Jones likewise told one of his employees that Crinel was not receiving the number of patients she expected and that the employee needed "to schedule more health fairs" in order "[t]o find patients." This evidence suggests that Jones's unnecessary referrals were done with intent to deceive.[58] Considered together, this evidence is sufficient for a jury to conclude that Jones's actions were fraudulent.

## IV

Henry Evans was convicted of five counts of substantive health care fraud. Count 31 concerned patient JoWi and Counts 43 through 46 concerned patient MaGr. He challenges his convictions and his sentence.

## A

Whether there was sufficient evidence to convict Evans as to Count 31 of the indictment is complicated by the fact that both Evans and the government

---

[58] *See United States v. Gibson*, 875 F.3d 179, 186 (5th Cir. 2017) (indicating that a persistent focus on the number of patients being referred for health care services can be indicative of fraudulent intent).

confused the true identity of patient JoWi. In 2009, Evans had originally treated a patient named JoWi (JoWi1). In 2013, he was asked to certify a different patient with the same first and last name as JoWi1 for home health care (JoWi2). Evans did so without meeting her. According to his trial testimony, he had certified JoWi2 for home health care under the mistaken belief that she was in fact JoWi1.

During the investigation of this case, the case agent discovered the 2013 JoWi2 home health certification. The case agent mistakenly believed that JoWi2 and JoWi1 were one in the same and that Evans had certified JoWi1 for home health care when he had not seen her since 2009. As a result, the government alleged the following in the indictment:

> Medicare Beneficiary JoWi: It was further part of the scheme to defraud that Medicare beneficiary JoWi began home health at Abide after she was referred by her treating physician to home health for wound care after a hospitalization. Beginning in July 2013, E[vans] began certifying JoWi for home health at Abide, even though the last documented visit E[vans] had with JoWi was in October 2009. E[vans] certified JoWi for at least two (2) additional episodes of home health at Abide between July 2013 and February 2014.

At trial, the case agent attempted to clarify the issue for the jury. Evans reinforced his understanding of events when he testified in his own defense.

On appeal, Evans contends the aforementioned confusion led to either an impermissible constructive amendment of the indictment or a sufficiency-of-the-evidence issue.

## 1

Evans argues that the indictment's confusion between JoWi1 and JoWi2 resulted in a constructive amendment of the indictment in violation of the Fifth Amendment of the Constitution. But Evans only fully addresses the merits of this argument in his reply brief. It is well settled in this circuit that "a

defendant waives an issue if he fails to adequately brief it."[59] We consequently do not consider this issue.

**2**

Evans contends that the confusion about JoWi resulted in a sufficiency-of-the-evidence issue.  Evans argues that if Count 31 referenced JoWi1, there was no evidence he ever fraudulently certified her for home health care.  Thus, he could not be convicted on that count.  He also argues that the same result holds if Count 31 referenced JoWi2 because there was insufficient evidence to prove the conduct was criminal.  He argues there was no evidence showing that JoWi2 was ineligible for home health care or that his certification of her for home health care was done with the requisite fraudulent intent.  Additionally, Evans argues his "mistake of fact" defense—namely, that he mistook JoWi1 for JoWi2—prevents him from being convicted.  Evans is not entitled to relief under either premise.

As an initial matter, we note that we need not and therefore do not address whether there was sufficient evidence introduced as to Count 31 if that count was intended to refer to JoWi1.  The indictment can be read to suggest Count 31 intended to reference JoWi1.  But any resulting confusion in the indictment as to the "true identity" of JoWi was eliminated at trial once the government's case agent and Evans himself testified.  At that point, all parties involved—including the jury—understood Count 31 concerned JoWi2, and specifically, that the issue was whether the certification pertaining to that patient constituted fraud.  Because the jury in this case was amply aware that Count 31 turned on whether the JoWi2 billing was fraudulent, we need only consider whether sufficient evidence was offered to support that count.

---

[59] *See United States v. Martinez*, 263 F.3d 436, 438 (5th Cir. 2001).

The jury heard evidence that Evans twice certified JoWi2 as homebound, under his care, and in need of skilled services even though he had never met her. There was evidence suggesting that certification was done with fraudulent intent. The circumstances surrounding the JoWi certification were, to say the least, suspicious. Evans's defense to this claim amounted to a self-serving admission that he mistakenly believed JoWi2 to be JoWi1—*a patient he had not seen or treated in nearly five years*. The jury was entitled to judge Evans's veracity and to reach the opposite conclusion. Moreover, the inference of fraud that arises from the suspicious circumstances surrounding JoWi's certification becomes only stronger when one considers the ample evidence offered at trial that Evans had knowingly and falsely certified another patient, MaGr, as homebound. Upon collectively viewing this evidence, "it was not unreasonable for the jury to discredit Evans'[s] self-serving testimony, draw rational inferences from [his] actions, and find him guilty [on Count 31]." Contrary to Evans's arguments, the record contained sufficient evidence to establish each element of the charged offense.

**B**

For Counts 43 through 46, the indictment specifically alleged that Evans fraudulently billed Medicare for two episodes of home health care, the first episode beginning on April 1, 2012 and the second on November 27, 2012. The Medicare Part A and Medicare Part B billings for each of those episodes constituted the four relevant counts. As to why these billings were fraudulent, the indictment alleged: (1) "Evans falsely certified [diagnosis codes] on MaGr's 485s that were not medically supported in his treatment of MaGr;" (2) Evans certified MaGr for two episodes of home health care even though she did not qualify for home health care; and (3) Evans billed Medicare for care plan oversight of patients in home health care for 30 minutes or more each month despite the fact that he did not provide the requisite services.

No. 18-31074

Importantly, the theories of fraud identified in the indictment are merely theories as to why each billing constituted fraud. When evaluating the sufficiency of the evidence, we are concerned with the "essential *elements* of the crime."[60] Thus, on appeal, Evans must demonstrate insufficient evidence of each of these three allegations in order to merit a reversal.

The jury heard evidence demonstrating that, despite Evans's certifications to the contrary, MaGr was ineligible for home health care. Dr. Lutz provided testimony that MaGr "didn't seem to have any trouble getting around." Dr. Lutz also noted that there was no "indication in any medical record that supports [classifying MaGr as] homebound." Dr. Lutz stated that MaGr was certified for thirty-two episodes of care. He conceded that MaGr may have qualified for services at some point. Nevertheless, she did not need skilled nursing services continuously for that period. Coupled with the fact that Evans had a financial interest in home health referrals, there was sufficient evidence to establish that the two Medicare Part A billings and two Medicare Part B billings identified in Counts 43 through 46 constituted fraud.

## C

Evans asserts that the district court erred when it allowed Dr. Lutz to testify as an expert witness. Dr. Lutz testified on behalf of the government as "an expert in the field of internal medicine and the medical necessity of home health services." Out of the presence of the jury, the government presented Dr. Lutz's qualifications to the court. The prosecution elicited, *inter alia*, that Dr. Lutz: (1) received his medical doctorate from Tulane University School of Medicine and a master's degree in public health from Tulane University School of Public Health and Tropical Medicine; (2) previously served as the Director

---

[60] *Gibson*, 875 F.3d at 185 (emphasis added) (quoting *United States v. Vargas-Ocampo*, 747 F.3d 299, 303 (5th Cir. 2014) (en banc)).

of Health for the City of New Orleans; (3) received numerous awards throughout his career; and (4) had previously taught at Tulane University. The defense challenged Dr. Lutz's qualifications by eliciting, *inter alia*, that (1) he had never before testified "regarding the medical necessity [of] home health services;" (2) he had "never studied home health;" and (3) that Dr. Lutz had never seen several of the patients about whom he was called upon to testify. The judge qualified Dr. Lutz as an expert.

Dr. Lutz testified on a variety of subjects. He provided insight into the various medical conditions identified in each patient's file, pointed out apparent contradictions between a physician's proposed treatment plan and the patient's complaints, and addressed whether a patient needed skilled nursing services. Dr. Lutz also testified that the patients identified in the indictment "may have needed home health for short periods of time, but none of them needed it for the continuous periods of time that [they] were consistently certified and recertified for." He was subject to vigorous cross-examination by defense counsel.

On appeal, Evans contends that the admission of Dr. Lutz's testimony constituted error. Evans's primary contention is that "Dr. Lutz's testimony . . . [was] not based on the 'reliable principles and methods' relevant to this case—the Medicare regulations." He specifically points to a bench conference in which counsel for the government acknowledged that (1) Dr. Lutz was not asked "anything about the regulations" during direct examination and (2) knowledge of the regulations was "out of [Dr. Lutz's] experience." Evans notes that the district court acknowledged that Dr. Lutz was not qualified to speak about the relevant regulations. Addressing Dr. Lutz's testimony, the court noted the following:

> But he hasn't testified -- all he -- he has said in his opinion as a
> doctor making a decision about whether someone needs home

health care services, that that would have an impact on his thoughts about whether they needed it. Now, whether that technically under the Medicare regulations affects the determination, I don't think this witness is qualified to testify about that.

Evans argues that "[t]he district court's statement is remarkable, given that Dr. Lutz had just finished two days of testimony as the [g]overnment's 'expert,' [during which] he stated definitively that in his expert opinion the eight patients named in the indictment were not 'homebound.'"

Evans also alleges Dr. Lutz had a "highly flawed view of home health care." Evans points to transcript excerpts in which Dr. Lutz acknowledges that his definition of "homebound" differs from Medicare's:

> My definition -- or my thinking of homebound is when somebody has an illness where they literally can't get out of the house without doing an ambulance or something, or where it takes an army or a village or something to get them out. I think that the -- I think that the Medicare definition that you're talking about in Chapter 7 is liberal and allows home health care to a larger number of people . . . .

This testimony is concerning, Evans argues, because he "was being tried for fraudulently violating the *Medicare* regulations[,] not violating Dr. Lutz's personal definition of 'homebound.'" He alleges that "an opinion divorced from [Medicare's] regulation[s] is unreliable and therefore, inadmissible." The district court's refusal to read the applicable Medicare regulations to the jury, Evans contends, "compounded" the error created by admitting Dr. Lutz's testimony.

When evaluating the propriety of expert testimony, we turn to the Federal Rules of Evidence, which dictate the admission of expert testimony in federal trials. Under Rule 702, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:" (1) the testimony is helpful to the trier of fact,

(2) "the testimony is based on sufficient facts or data," (3) "the testimony is the product of reliable principles and methods," and (4) "the expert has reliably applied the principles and methods to the facts of the case."[61]  Thus, "[e]xpert testimony is admissible only if it is both relevant and reliable."[62]

"A trial court's decision to admit expert evidence is reviewed for abuse of discretion."[63]  As a general matter, district courts are afforded "wide latitude" when it comes to the admissibility of expert testimony.[64]  Thus, this court will only disturb the district court's decision to admit expert testimony if the decision was "manifestly erroneous."[65]  "A manifest error is one that 'is plain and indisputable, and that amounts to a complete disregard of the controlling law.'"[66]  Even if this court concludes the district court did err when it admitted expert testimony, this court will not reverse a defendant's conviction if the error was harmless.[67]

Here, the district court's decision to admit Dr. Lutz's testimony did not constitute an abuse of discretion.  Evans's contentions on appeal turn on the scope of Dr. Lutz's testimony.  As previously stated, Dr. Lutz was allowed to offer his opinions as "an expert in the field of internal medicine and the medical necessity of home health services."  Within those parameters, Dr. Lutz was qualified to testify about a variety of topics.  After reviewing a relevant patient's medical records, he was capable of (1) defining medical terminology, (2) identifying apparent contradictions between a physician's treatment plan

---

[61] FED. R. EVID. 702.

[62] *United States v. Hodge*, 933 F.3d 468, 477 (5th Cir. 2019) (quoting *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002)).

[63] *Puga v. RCX Sols., Inc.*, 922 F.3d 285, 293 (5th Cir. 2019) (citing *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 351 (5th Cir. 2007)).

[64] *Id.* (quoting *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 988 (5th Cir. 1997)).

[65] *Id.* (quoting *Watkins*, 121 F.3d at 988).

[66] *Id.* (quoting *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004)).

[67] *United States v. Wen Chyu Liu*, 716 F.3d 159, 167 (5th Cir. 2013) (citing *Kanida v. Gulf Coast Med. Pers. LP*, 363 F.3d 568, 581 (5th Cir. 2004)).

and a patient's complaints, (3) opining as to whether a patient needed skilled nursing care, and (4) analyzing whether a patient's medical file supported his or her physician's conclusion that he or she suffered from a particular condition. A medical doctor with Dr. Lutz's experience can answer questions about these topics after reviewing an individual patient's medical records. The district court did not abuse its discretion to the extent it permitted Dr. Lutz to testify about these subjects.

Whether Dr. Lutz was qualified to testify about the "medical necessity of home health services" is a more difficult question. Although the record is not entirely clear, the district court appears to have drawn a distinction between "the medical necessity of home health services" and whether the patient *qualified* for home health care under Medicare. For example, the district court noted the following during a bench conference:

> So [Dr. Lutz] was qualified as an expert in internal medicine and the medical necessity of home health services, which I interpreted to mean this was for -- and his testimony was more about, would this -- does this person need someone to come to their home? Would it be good for them for someone to come to their home as opposed to them going to the doctor's office? But he was not, he was not qualified as an expert in Medicare regulations and he wasn't questioned about that.

The district court ruled that Dr. Lutz could offer his opinion as a practitioner as to whether a particular patient needed home health care. In contrast, Dr. Lutz could not testify about whether a particular patient qualified for home health care under *Medicare*.

Allowing Dr. Lutz to testify about whether he believed a patient was homebound arguably may have injected confusion at trial. Evans correctly notes that "whether a patient is 'homebound[]' . . . is a medico-legal determination." To the extent that the Medicare regulations provide guidance

as to which patients qualify as homebound, it is akin to a term of art. But the word also has meaning outside of these parameters.

At numerous times throughout Dr. Lutz's testimony, Dr. Lutz noted that certain patients were not homebound. But, for many of these occasions, Dr. Lutz failed to clarify whether his determination was based on his own definition of homebound or on Medicare's. Dr. Lutz's testimony as to his comparatively conservative view of home health care's requirements only served to further complicate the matter. For borderline cases, there thus existed a very real possibility that a patient would have qualified for home health care under Medicare while also not being homebound under Dr. Lutz's standard. In these instances, Dr. Lutz's determinations as to the homebound status of these patients could have, at a minimum, confused the jury. At worst, his determinations could have misled them. Nevertheless, the fact that Dr. Lutz's determinations *could* have confused or potentially misled the jury fails to amount to an abuse of discretion by the trial court.

The fact that some of Dr. Lutz's testimony may have been potentially misleading or confusing comes close, but ultimately does not amount to a "plain and indisputable" error.[68] Nor can we conclude it rises to the level of "a complete disregard of the controlling law."[69] We are certainly troubled by some aspects of Dr. Lutz's testimony. Nevertheless, we cannot conclude these aspects of Dr. Lutz's testimony amounted to manifest error.[70] Indeed, despite challenging Dr. Lutz's qualifications, defense counsel did not object to specific questions eliciting, during direct examination, Dr. Lutz's ambiguous assessment of patients' homebound status and consequent need for home health services. Instead, counsel's effective cross-examination resolved these

---

[68] *Puga*, 922 F.3d at 293 (quoting *Guy*, 394 F.3d at 325).
[69] *Id.* (quoting *Guy*, 394 F.3d at 325).
[70] *See id.*

ambiguities and clearly demonstrated for the jury that Dr. Lutz's determinations were based on his own, more conservative view of which patients were in fact "homebound."[71]  Further, the "presentation of contrary evidence[] and careful instruction on the burden of proof" were other available means of adequately addressing any confusion that resulted from Dr. Lutz's testimony.[72]

**D**

Evans argues that the district court procedurally and substantively erred in imposing his sentence.  His sentence turned largely on the amount of loss resulting from his fraudulent conduct.[73]  During the intervening 16 months between Evans's conviction and sentencing, both Evans and the government presented each of their proposed loss calculations to the court. Four days prior to sentencing, Evans requested permission to cross examine a government witness as to the loss calculation and to present his own expert testimony concerning his proposed calculation at sentencing.  The district court denied his request, noting that "evidence relevant to the loss allocation had been presented at the trial, that the parties have had the opportunity to do extensive briefing on the issue, and that, as a result, no live testimony will be allowed at the sentencing hearing."  The court permitted, however, "Evans to proffer his own expert's testimony about loss calculations on the record at the conclusion of the hearing."  Evans filed a motion to reconsider two days before sentencing.  He stressed that he had been prohibited "from putting on 'evidence regarding the admission of worthy patients into home health care' or 'evidence

---

[71] *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993) (noting that "[v]igorous cross-examination[ is one of] the traditional and appropriate means of attacking shaky but admissible evidence" (citing *Rock v. Arkansas*, 483 U.S. 44, 61 (1987))).

[72] *Id.* at 596 (citing *Rock*, 483 U.S. at 61).

[73] *See* U.S. SENT'G GUIDELINES MANUAL § 2B1.1(b)(1) (U.S. SENT'G COMM'N 2016).

of specific instances of uncharged proper Medicare billing[s]' during the trial." Thus, in his estimation, not all of the "evidence relevant to the loss allocation had been presented at the trial." Nevertheless, the district court refused to reconsider its original ruling.

At oral sentencing, the district court first defined what it considered to be each physician's relevant conduct under section 1B1.3 of the Guidelines. The defendants collectively had engaged in jointly undertaken criminal activity. But the district court held that "the scope of [each physician's] jointly undertaken criminal activity encompassed only the fraudulent conduct relating to each defendant['s] own acts and patients." Next, the court found that the actual loss resulting from Evans's scheme exceeded his intended loss; thus, actual loss would be used to calculate his advisory range. It then determined that actual loss in this case included "all Medicare payments made to both Abide and [Evans] for all of [Evans's] patients." Under this framework, actual loss included not only Evans's fraudulent billings, but some legitimate billings as well. The court cited *United States v. Hebron*, however, which held that "whe[n] the government has shown that the fraud was so extensive and pervasive that separating legitimate benefits from fraudulent ones is not reasonably practicable, the burden shifts to the defendant to make a showing that particular amounts are legitimate."[74] Here, the court concluded that the fraud was pervasive and Evans had failed to produce evidence demonstrating which bills were legitimate and which were fraudulent. Subsequently, the court found that the actual loss resulting from Evans's offense totaled $1,262,043.

---

[74] 684 F.3d 554, 563 (5th Cir. 2012).

No. 18-31074

**1**

Evans first contends that the district court's "refusal to hold an evidentiary hearing on [the question of loss] violated [his] [d]ue [p]rocess rights." According to Evans, an evidentiary hearing would have allowed him to "put forth evidence of both legitimate billings and legitimately rendered services [that could have been] deducted from the total loss amount." To buttress his argument, he points to the apparent contradiction between the district court concluding Evans failed to produce evidence of legitimate billings and legitimately rendered services on the one hand, and, on the other hand, the district court's refusal to permit an evidentiary hearing at which such evidence could have been presented.

Evans's contention requires us to look to the commentary to section 6A1.3 of the Guidelines, which provides guidance as to the appropriate procedures when facts impacting sentencing are in dispute.[75] It instructs that "[w]hen a dispute exists about any factor important to the sentencing determination, the court must ensure that the parties have an adequate opportunity to present relevant information."[76] "Written statements of counsel or affidavits of witnesses may be adequate under many circumstances."[77] The commentary further provides that "[a]n evidentiary hearing may sometimes be the only reliable way to resolve disputed issues."[78] In this circuit, a district court's refusal to hold an evidentiary hearing is reviewed for an abuse of discretion.[79] "[W]e have recognized that there is no abuse of discretion when a

---

[75] U.S. SENT'G GUIDELINES MANUAL § 6A1.3 cmt. (U.S. SENT'G COMM'N 2016).

[76] *Id.*

[77] *Id.* (citing *United States v. Ibanez*, 924 F.2d 427 (2d Cir. 1991)).

[78] *Id.* (collecting cases).

[79] *United States v. Henderson*, 19 F.3d 917, 927 (5th Cir. 1994).

No. 18-31074

defendant has an opportunity to review the PSR and submit formal objections to it."[80]

Here, the district court did not abuse its discretion when it refused Evans's request for an evidentiary hearing. Evans had ample opportunity prior to sentencing to present evidence relevant to the loss calculation. Affidavits and statements by counsel are but two examples.[81] Evans was given the opportunity to proffer his expert's testimony about the loss calculations at the end of the hearing. It is ultimately the district court that must make the factual determinations relevant for sentencing purposes.[82] The district court's decision that an evidentiary hearing was unnecessary should be given considerable deference by this court.[83] Here, its decision to not take live testimony prior to sentencing did not amount to an abuse of discretion based on this record.

**2**

Next, Evans contends the methodology employed by the district court to calculate actual loss in this case was flawed. He raises three sub-arguments.

**a**

First, Evans challenges the district court's decision to apply *Hebron*'s burden-shifting framework.[84] Specifically, he contends "there was no basis for the court's conclusion that 'the fraud in this case was pervasive and difficult to detect,'" thereby there was no basis to shift the burden to him to demonstrate

---

[80] *United States v. Tuma*, 738 F.3d 681, 693 (5th Cir. 2013) (citing *United States v. Patten*, 40 F.3d 774, 777 (5th Cir. 1994) (per curiam)).

[81] *See Henderson*, 19 F.3d at 927 (noting that the defendant's "due process rights were protected adequately" because "[h]e could have filed affidavits and other exhibits in support of" any formal objections he filed to the PSR and that "[a]t the sentencing hearing, [he] presented several exhibits and objected to some of the exhibits proffered by the government").

[82] *See United States v. Nava*, 624 F.3d 226, 230-31 (5th Cir. 2010); *see also* U.S. SENT'G GUIDELINES MANUAL § 6A1.3(a) (U.S. SENT'G COMM'N 2016).

[83] *Henderson*, 19 F.3d at 927.

[84] *See United States v. Hebron*, 684 F.3d 554, 562-63 (5th Cir. 2012).

which, if any, billings were legitimate.  He notes initially that this circuit has not yet articulated which standard of review applies to a court's determination that a particular fraud is pervasive.[85]  Because "this determination constitutes a 'method' of determining the loss amount," however, he argues de novo review should apply.  As to the merits of his contention, he points to the fact that he "was acquitted of both conspiracy charges[] and convicted only of fraud with regard to three episodes of care."  Moreover, he notes that the government failed to offer any evidence of fraud relating to treatment of patients not identified in the indictment.  "Consequently," he argues, "there was no basis for the court's conclusion that 'the fraud in this case was pervasive and difficult to detect.'"  To the extent Abide may have been engaged in a pervasive fraud with other physicians, "there was no such showing with regard to [Evans]."

We conclude that clear-error review is the appropriate standard.  Admittedly, the standard of review for loss determinations is somewhat complicated.  We "consider [de novo] *how* the [sentencing] court calculated the loss, because that is an application of the [G]uidelines, which is a question of law."[86]  "[Clear-error] review applies to the background factual findings that determine whether . . . a particular method is appropriate."[87]  If we affirm the district court's methodology under this framework, we then review the application of the methodology to the facts of the particular case for clear error.[88]

With those standards in mind, one can plausibly categorize *Hebron*'s burden-shifting framework as a "method" of determining actual loss, which

---

[85] *See United States v. Ezukanma*, 756 F. App'x 360, 372 (5th Cir. 2018) (per curiam).

[86] *United States v. Klein*, 543 F.3d 206, 214 (5th Cir. 2008) (emphasis added) (citing *United States v. Saacks*, 131 F.3d 540, 542-43 (5th Cir. 1997)).

[87] *United States v. Isiwele*, 635 F.3d 196, 202 (5th Cir. 2011) (citing *United States v. Harris*, 597 F.3d 242, 251 n.9 (5th Cir. 2010)).

[88] *See United States v. Cooper*, 274 F.3d 230, 238 (5th Cir. 2001).

No. 18-31074

would be subject to de novo review. But we believe it is more appropriate to define a district court's "pervasiveness determination" as a background factual finding that informs the ultimate methodology employed by the court. After all, the district court must first determine that a fraud is pervasive before invoking the procedures outlines in *Hebron*.[89] We therefore review Evans's first argument, which concerns a factual determination by the district court, for clear error.

Under that standard, we agree with the district court that Evans's fraud was pervasive. The statistical evidence presented during trial concerning case-mix diagnoses is persuasive. The case-mix diagnoses codes were "used to increase [Abide's] Medicare[] reimbursement[s]." Dr. Solanky, a government witness, provided statistical evidence regarding seven of the codes. Dr. Solanky's testimony indicated that a greater percentage of Evans's patients had been diagnosed with each of those diagnostic codes than other providers in Louisiana. For six of the diagnostic codes, the disparity was statistically significant, meaning they did not occur "by . . . chance." In light of this evidence, the district court's conclusion that Evans's fraud was pervasive is more than plausible.[90] We will not disturb the district court's decision to apply *Hebron*'s burden-shifting framework in this case.

**b**

Second, Evans argues the district court failed to make the requisite findings that he engaged in a conspiracy with Abide. He relies on *United States v. Jimenez*, an unpublished case, to support his argument.[91] There, the defendant had been found guilty of conspiracy to possess with intent to

---

[89] *Hebron*, 684 F.3d at 563.

[90] *See Cooper*, 274 F.3d at 238 (citing *United States v. Puig-Infante*, 19 F.3d 929, 942 (5th Cir. 1994)) ("A factual finding is not clearly erroneous if it is plausible in light of the record read as a whole.").

[91] 77 F. App'x 755 (5th Cir. 2003) (summary calendar).

distribute marijuana.[92] At sentencing, the district court determined that the defendant's "jointly-conducted activity" extended to a separate drug transaction involving cocaine.[93] This court vacated and remanded for resentencing "[b]ecause the record reflect[ed] no explicit finding regarding whether the distribution of cocaine was within the scope of the criminal activity that [the defendant] agreed to undertake."[94]

Evans argues that if the district court wanted to hold him liable for Abide's fraudulent acts, the court must first specifically find that those acts were "(i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity."[95] He asserts that "the district court only addressed the 'scope' of [his] relevant conduct, which it defined as 'fraudulent conduct relating to [Evans's] own acts and . . . patients.'" Without addressing the remaining two requirements, Evans contends, the district court could not hold him liable for anything other than his own actions, actions which included nothing more than "the amount [Medicare] paid for JoWi and MaGr in the counts of conviction."

Ultimately, however, Evans's argument is without merit. Admittedly, the sentencing transcript does suggest that the district court only directly addressed section 1B1.3(a)(1)(B)'s first requirement, namely whether Abide's conduct was "within the scope of the jointly undertaken criminal activity."[96] It noted, "[t]he [c]ourt finds as a matter of fact that the *scope* of Barnes, Evans, Michael Jones, and . . . Molden's jointly undertaken criminal activity encompassed only the fraudulent conduct relating to each defendant['s] own

---

[92] *Id.* at 756.
[93] *Id.* at 757-58.
[94] *Id.* at 760.
[95] U.S. SENT'G GUIDELINES MANUAL § 1B1.3(a)(1)(B) (U.S. SENT'G COMM'N 2016).
[96] *Id.* § 1B1.3(a)(1)(B)(i).

acts and patients." The court did not appear to have expressly addressed the remaining two requirements.

Nevertheless, the district court implicitly recognized that the remaining two requirements were satisfied. The district court went to great pains to follow Fifth Circuit precedent during sentencing. The court noted it was required to expressly find each of section 1B1.3(a)(1)(B)'s requirements. It then outlined why the government's articulation of each defendant's relevant conduct—namely, that each physician was in a conspiracy not merely with Abide, but with each of the other physicians—did not satisfy those requirements. Thereafter, the district held that "the scope of [each physician's] jointly undertaken criminal activity encompassed only the fraudulent conduct relating to each defendant['s] own acts and patients." Viewed in context, the record thus suggests the district court believed the remaining two requirements were met as well. That is, by first outlining the requirements, then rejecting the government's articulation of each defendant's jointly undertaken criminal activity, and finally concluding that a different articulation was more appropriate, the judge implicitly recognized that its own articulation met section 1B1.3(a)(1)(B)'s requirements.

Moreover, as this court noted in *United States v. Puig-Infante*, district courts are permitted "to make implicit findings by adopting the PSR."[97] Here, the district court adopted the PSR's factual findings, which thoroughly described the overall conspiracy and Evans's role in it.

**c**

Third, relying on evidence proffered after sentencing, Evans argues that "the district court erroneously included billings that occurred both before and

---

[97] 19 F.3d 929, 943 (5th Cir. 1994) (quoting *United States v. Carreon*, 11 F.3d 1225, 1231 (5th Cir. 1994)).

after [Evans's] agreement with Abide." By his calculations, his actual-loss total is reduced by $52,947.

Because Evans's contention does not affect his Guidelines calculation, it is only necessary to consider his argument as it relates to the court's restitution order. The district court ordered restitution in this case pursuant to the Mandatory Victim's Restitution Act of 1996 (MVRA).[98] "The MVRA authorizes restitution to a victim 'directly and proximately harmed' by a defendant's offense of conviction."[99] Restitution orders are reviewed under an abuse of discretion standard,[100] with factual findings reviewed for clear error.[101] Importantly, "[a]n award of restitution greater than a victim's actual loss exceeds the MVRA's statutory maximum."[102]

Under these standards, we will not vacate Evans's restitution order. We assume without deciding that we may consider the evidence Evans proffered after sentencing. Nevertheless, this evidence does little to call into question the district court's calculations. The loss calculation in this case turned, in part, on the length of time Evans participated in the conspiracy. As a result, Evans's proffered report turns largely on the case agent's opinion as to when Evans's involvement in the conspiracy started and ended. According to Evans's expert, the case agent concluded that Evans was involved in a conspiracy with Abide from September 29, 2011 through January 31, 2014. But because the government exhibits used to calculate actual loss covered more than just that particular period, Evans's expert concludes that the government exhibits

---

[98] *See* 18 U.S.C. § 3663A.

[99] *United States v. Sharma*, 703 F.3d 318, 322 (5th Cir. 2012) (quoting 18 U.S.C. § 3663A(a)(2)) (citing 18 U.SC. § 3663A(a)(1), (c)(1)).

[100] *Id.* (citing *United States v. Mann*, 493 F.3d 484, 498 (5th Cir. 2007)).

[101] *Id.* (citing *United States v. Beydoun*, 469 F.3d 102, 107 (5th Cir. 2006)).

[102] *Id.* (first citing *United States v. Chem. & Metal Indus., Inc.*, 677 F.3d 750, 752 (5th Cir. 2012); and then citing *Beydoun*, 469 F.3d at 107).

No. 18-31074

"include claims that are outside of the time period of [Evans's] business affiliation with Abide." Importantly, though, the district court's determination as to Evans's start and end dates differed from the government's case agent.

Notably, although Evans proffered his expert's report after sentencing, the expert report was drafted two days before sentencing. The expert therefore could not have known before writing the report that the district court would select different start and end dates for Evans's conspiracy than those suggested by the case agent. In contrast to the case agent, the court concluded that the start and end dates for Evans's involvement in the conspiracy were September 11, 2011 and June 9, 2014, respectively.

Ultimately, Evans's proffered report does little to challenge the district court's restitution order and hardly demonstrates that the district court's factual findings were clearly erroneous. We therefore decline Evans's request to remand his case to the district court for resentencing.

**E**

Lastly, Evans contends the district court substantively erred during his sentencing. He argues the district court "failed to consider [several] categories of evidence in determining the loss amount." Specifically, he points to the types of evidence he would have offered at an evidentiary hearing: (1) "additional evidence[] to rebut the presumption that the amount billed accurately depicts the loss amount;" (2) "evidence of . . . legitimate billings;" and (3) "evidence of . . . legitimately rendered services." After considering the totality of the circumstances, though, we believe his sentence was substantively reasonable.[103] Sentences within the correctly calculated Guidelines range are

---

[103] *See Gall v. United States*, 552 U.S. 38, 51 (2007) ("When conducting [a review of the substantive reasonableness of the sentence], the court will, of course, take into account the totality of the circumstances, including the extent of any variance from the Guidelines range.").

afforded a presumption of reasonableness.[104]    Here, Evans's correctly calculated advisory Guidelines range called for between 63 and 78 months in prison. The court granted a downward variance to 50 months in prison. This below-Guidelines sentence is afforded a presumption of reasonableness in this court and Evans has not sufficiently rebutted that presumption. We therefore affirm his sentence.

## V

## A

Paula Jones's first issue on appeal concerns whether the government produced sufficient evidence to convict her of conspiracy to commit health care fraud (Count 1) and conspiracy to violate the anti-kickback statute (Count 2).

As to Count 1, Jones, like her co-defendants, had a financial incentive to engage in a conspiracy to commit health care fraud. The government also presented evidence demonstrating: (1) Jones's awareness that Abide needed to bill $2,100 to break even for each home health care episode; (2) the fact that she would generate reports monitoring the average revenue for home health episodes weekly; (3) the fact that when a bill did not reach $2,100, she would "g[i]ve the files back to the case managers to see if they could get the score up to at least $2,100[;]" (4) the fact that she routed one of Michael Jones's billings without his required signature; and (5) the fact that Jones, as Abide's biller, routed each of the physicians' fraudulent bills to Medicare. Further, evidence that she had "a '911' code" in the event law enforcement arrived also provided circumstantial evidence that she was aware criminal activity was afoot.

---

[104] *United States v. Smith*, 440 F.3d 704, 707 (5th Cir. 2006) (citing *United States v. Alonzo*, 435 F.3d 551, 553-54 (5th Cir. 2006)); *see also United States v. Diehl*, 775 F.3d 714, 724 (5th Cir. 2015) (noting that "review for substantive reasonableness is highly deferential, because the sentencing court is in a better position to find facts and judge their import under the § 3553(a) factors with respect to a particular defendant" (internal quotation marks omitted) (quoting *United States v. Hernandez*, 633 F.3d 370, 375 (5th Cir. 2011))).

No. 18-31074

As to Count 2, Jones's awareness of the fact that her salary was tied to Michael Jones's referrals, her continued receipt of that salary, and her 911 code are more than enough for a rational jury to conclude that she agreed to participate in a conspiracy involving health care kickbacks.

## B

Jones maintains that the district court erred when it refused to sever her from trial with the other defendants. Numerous times during trial, Jones moved under Rule 14 for relief from prejudicial joinder. Under Rule 14, "[i]f the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires."[105] The trial court denied each of those requests. On appeal, Jones argues the district court's refusal to sever her trial from the remaining defendants constituted error. She argues a joint trial resulted in prejudicial spillover and argues that the judge's limiting instructions inadequately addressed the prejudicial effect of a joint trial. We disagree.

"We review the denial of a motion to sever a trial under the exceedingly deferential abuse of discretion standard."[106] Severance under Rule 14 is proper "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence."[107] "[A] defendant 'must prove that: (1) the joint trial prejudiced him [or her] to such an extent that the district court could

---

[105] FED. R. CRIM. P. 14(a).

[106] *United States v. Reed*, 908 F.3d 102, 114 (5th Cir. 2018) (internal quotation marks omitted) (quoting *United States v. Chapman*, 851 F.3d 363, 379 (5th Cir. 2017)).

[107] *Id.* (quoting *United States v. Mitchell*, 484 F.3d 762, 775 (5th Cir. 2007)).

not provide adequate protection; and (2) the prejudice outweighed the government's interest in economy of judicial administration.'"[108]

Here, the district court did not abuse its discretion when it refused to grant Jones's request for a separate trial.  Jones's argument relies heavily on her assertion that evidence aimed at her co-defendants would likely spillover into her case.  But the evidence adduced against the remaining defendants was largely relevant to Jones's conduct as well.  The substantive evidence adduced against the remaining defendants largely established a "culture of fraud" at Abide.  That same evidence, the district court noted, was relevant to whether "employees, like [Jones], knew or should have known that their activities were part of a conspiracy to defraud Medicare."  Jones thus largely exaggerates the spillover risks in this case.

Moreover, the district court's instructions adequately alleviated the risk of unfair prejudice.  The district court's instruction to consider each count separately was "sufficient to prevent the threat of prejudice resulting from [a joint trial]."[109]  Likewise, the district court did not err in refusing to read Jones's hand-crafted instructions—instructions Jones contends would have further reduced the risk of unfair prejudice.  The district court refused to read her proposed instructions because they were more akin to a closing argument, than jury instructions.  We have "repeatedly rejected requested instructions that are 'more in the nature of a jury argument than a charge,'" and do so again here.[110]

As the district court correctly noted, "[t]he rule, rather than the exception, is that persons indicted together should be tried together, especially

---

[108] *Id.* (quoting *United States v. Rodriguez*, 831 F.3d 663, 669 (5th Cir. 2016)).

[109] *United States v. Whitfield*, 590 F.3d 325, 356 (5th Cir. 2009) (quoting *United States v. Massey*, 827 F.2d 995, 1005 (5th Cir. 1987)).

[110] *United States v. Thompson*, 761 F. App'x 283, 292 (5th Cir. 2019) (per curiam) (quoting *United States v. Lance*, 853 F.2d 1177, 1184 (5th Cir. 1988)).

No. 18-31074

in conspiracy cases."[111]  Jones fails to explain adequately why her case is the exception and not the rule.  The district court did not abuse its discretion when it declined to grant Jones's severance motion.

### C

We next consider if the district court procedurally erred when calculating the total-loss amount applicable to Jones's sentence and restitution order.

Jones's advisory Guidelines range and her restitution order turned on the amount of loss resulting from the fraud.  The court ultimately concluded that "the reasonably foreseeable pecuniary harm" in this case was $3,106,954.[112]  It arrived at that figure by first determining that Abide had billed $4,124,591.20 to Medicare during the relevant period and then reducing that total by 32 percent because Jones was only logged into Kinnser for 68 percent of the relevant time period.

On appeal, Jones contends the district court procedurally erred in calculating her advisory sentence.  She also alleges the district court's restitution order, which mirrored the district court's loss-calculation, was inflated.  She argues that "[t]o hold her accountable for a loss amount of over $3 million vastly exaggerates her very limited role in the alleged conspiracy." She contends the district court erred when it concluded that all of Abide's Medicare billings were foreseeable losses.  "As a biller for the company," she notes, "she would have no way of knowing whether . . . the doctors had actually seen the patients in question, let alone whether those patients actually . . . qualified for home health care."  To demonstrate the significance

---

[111] *United States v. Pofahl*, 990 F.2d 1456, 1483 (5th Cir. 1993).
[112] U.S. SENT'G GUIDELINES MANUAL §§ 2B1.1 cmt. n.3(A)(i) (U.S. SENT'G COMM'N 2016); *see also* U.S. SENT'G GUIDELINES MANUAL §§ 2B1.1(b)(1) (U.S. SENT'G COMM'N 2016).

of the district court's error, Jones notes her loss amount was substantially greater than all of the physicians in the conspiracy.

We review sentencing decisions to ensure they are reasonable.[113] Jones specifically challenges the district court's loss calculation and its effect on the advisory Guidelines calculation. If correct, her allegation would constitute significant procedural error.[114] As to the standard of review applied to Jones's appeal, Jones takes issue with the factual predicates underlying the district court's methodology. That is, she argues the district court erred insofar as it determined that all billings Jones approved using Kinnser were "the reasonably foreseeable pecuniary harm [of her] offense."[115] Her contention is thus subject to clear-error review.[116]

Here, the district court's factual finding survives clear-error review. The district court's well-reasoned statement from the bench adequately justified its decision to hold Jones accountable for $3,106,954 in actual losses. The district court noted that (1) "Jones participated in all of Abide billings, including fraudulent billings;" (2) "her awareness of the fraud was much more extensive" than she alleges; and (3) "her agreement to jointly undertake criminal activity extended to the entire reach of the conspiracy." As previously outlined, these

---

[113] *United States v. Nguyen*, 854 F.3d 276, 280 (5th Cir. 2017) (citing *Gall v. United States*, 552 U.S. 38, 46 (2007)).

[114] *See Gall*, 552 U.S. at 51 (listing examples of "significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range").

[115] U.S. SENT'G GUIDELINES MANUAL § 2B1.1 cmt. n.3(A)(i) (U.S. SENT'G COMM'N 2016).

[116] *See United States v. Isiwele*, 635 F.3d 196, 202 (5th Cir. 2011) (citing *United States v. Harris*, 597 F.3d 242, 251 n.9 (5th Cir. 2010)).

No. 18-31074

conclusions find adequate support in the record. The district court's factual findings were thus plausible on the current record.[117]

The fact that Jones's loss amount exceeded that of the physicians in the conspiracy is not determinative. Because actual loss calculations turn on foreseeability,[118] this result makes logical sense. One spoke of a conspiracy—a physician, for example, in a health care fraud scheme—may be unable to foresee the true scope of the conspiracy. But a person who processes each bill of an organization he or she knows is engaged in fraudulent conduct *would* be able to foresee the full scale of the fraud.[119] Thus, despite Jones's contentions, the factual findings that formed the basis of the district court's loss-calculation methodology are not clearly erroneous. For the same reasons, the district court's restitution order survives appellate review.[120]

## VI

### A

Gregory Molden argues that there was insufficient evidence to convict him of conspiracy to commit health care fraud (Count 1), conspiracy to violate the anti-kickback statute (Count 2), and eleven counts of substantive health care fraud (Counts 32 through 42).

---

[117] *See United States v. Cooper*, 274 F.3d 230, 238 (5th Cir. 2001) (citing *United States v. Puig-Infante*, 19 F.3d 929, 942 (5th Cir. 1994)) ("A factual finding is not clearly erroneous if it is plausible in light of the record read as a whole.").

[118] *See* U.S. SENT'G GUIDELINES MANUAL § 2B1.1 cmt. n.3(A) (U.S. SENT'G COMM'N 2016).

[119] *Cf. United States v. Dehaan*, 896 F.3d 798, 808 (7th Cir. 2018) ("[R]egardless of whether the agencies themselves engaged in independent wrongdoing when they billed Medicare for these services, the billings were the direct and foreseeable result of DeHaan's fraud as the gatekeeper in certifying the patients; without his certification, the agencies could not have billed Medicare and Medicare would not have compensated the agencies for the services they provided. The Medicare payments are a reasonable approximation of the loss resulting from DeHaan's own criminal conduct . . . .").

[120] *See United States v. Mahmood*, 820 F.3d 177, 196 (5th Cir. 2016) (citing *United States v. Echols*, 574 F. App'x 350, 359 (5th Cir. 2014) (per curiam)); *see also Dehaan*, 896 F.3d at 808.

No. 18-31074

**1**

Molden contends there was insufficient evidence to find him guilty of either conspiracy charge.  As to Count 1, Crinel pleaded guilty to conspiring with Molden to commit health care fraud; evidence at trial suggested Molden had a financial incentive to join the conspiracy; and the statistical evidence is likewise probative of Molden's guilt.  The evidence related to each of Molden's substantive health care fraud counts similarly reinforces the jury's conclusion that Molden's actions were fraudulent.  Together, this evidence is more than enough for the jury to conclude that Molden participated in a conspiracy to commit health care fraud.

The evidence presented as to Count 2 is perhaps even more compelling.  Evidence presented at trial suggested Molden was paid $5,000 a month to work for Abide.  Before Molden entered into this arrangement with Abide, he had several form 485s at Abide that had yet to be signed.  According to Crinel, "in order for him to sign the 485s and to continue to send patients to [Abide], he wanted a salary."  Wilneisha Jakes also testified that Molden was being paid for patient referrals.  Coupled with the fact that Crinel admitted to paying Molden kickbacks, there was more than enough evidence to convict Molden on Count 2.

**2**

Likewise, Molden contends there was insufficient evidence to convict him of substantive health care fraud.  Counts 32 through 37 related to patient KeTr.  Counts 38 to 42 related to patient ShBe.  Unlike his co-defendants who argued they were unaware their patients did not qualify for home health care, Molden seems to argue his patients *did* qualify for these services.

As to patient KeTr, the jury could reasonably infer from Dr. Lutz's testimony that this patient did not qualify for home health care.  Molden had qualified KeTr for home health care because the patient suffered from Type 2

46

diabetes. But as Dr. Lutz noted, "Molden ordered blood tests on the same day he admitted [KeTr] to home health, and those blood tests came back [within normal levels]." Thus, according to Dr. Lutz, KeTr's diabetes was "perfectly controlled." Dr. Lutz also testified that nurses had difficulty locating KeTr while he was receiving home health care. During several visits to KeTr's home, nurses would knock on the door, but no one would answer. The logical inference from such evidence is that KeTr was not, in fact, homebound. In fact, he was eventually disenrolled from home health care after nurses could not locate him. Together, this evidence more than suggests KeTr was not homebound when Molden certified him for home health care. There was thus sufficient evidence to convict Molden of substantive health care fraud with regard to his treatment of KeTr.

As for patient ShBe, the evidence was also sufficient to convict Molden of substantive health care fraud. Dr. Lutz testified that: (1) ShBe's patient file lacked documentation to support Molden's diagnoses; (2) ShBe's diagnoses were shuffled; and (3) ShBe was not home during several home health visits. As an example of suspicious certifications, Dr. Lutz noted that eight days prior to Molden recertifying ShBe for an episode of home health care based on hypertension, her blood pressure had been normal. He further opined that ShBe did not require skilled nursing care. The jury could reasonably have concluded that ShBe did not require home health care.

**B**

Like Barnes, Molden argues the district court erred when it refused to read several Medicare instructions to the jury. For the reasons outlined earlier, the court did not abuse its discretion when it refused to read the proffered instructions to the jury.

No. 18-31074

## C

Like Evans, Molden argues the district court erred in permitting Dr. Lutz to testify as an expert.  For the reasons outlined earlier, the court's decision to permit such testimony did not amount to an abuse of discretion.

\* \* \*

The district court's judgment is AFFIRMED.